GATEWAY EXTERIORS, INC., a Missouri Corporation, Plaintiff/Respondent,

v.

SUNTIDE HOMES, INC., Defendant/Appellant.

No. 63764.

Missouri Court of Appeals, Eastern District, Division Two.

July 5, 1994.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 4, 1994.

Application to Transfer Denied Sept. 20, 1994.

Ellen Levy Siwak, Rosenblum, Goldenhersh, Silverstein, & Zafft, St. Louis, for appellant.

Joel David Brett, Barklage, Barklage, Haywood, & Brett, St. Charles, for respondent.

CRANE, Presiding Judge.

Plaintiff Gateway Exteriors, Inc. filed a petition seeking damages for breach of contract arising out of two alleged agreements with defendant, Suntide Homes, Inc., to pro-

vide and install siding. The jury returned a verdict for plaintiff on both counts and assessed damages at $38,648 on count one and $1,066.50 on count two. The trial court overruled defendant's post-trial motions, including its motion for judgment notwithstanding the verdict. Defendant appeals. We reverse and remand for entry of judgment in favor of defendant on the grounds that plaintiff failed to make a submissible case on the existence of either alleged contract.

## FACTUAL BACKGROUND

Plaintiff is a Missouri corporation owned by Charles Koehler and engaged in the residential siding business. Plaintiff supplied and installed vinyl siding, but not Masonite siding. Defendant is a builder and developer of residential homes. In the summer of 1990 defendant was developing the Tiffany Square subdivision. Although Masonite siding was standard on the Tiffany Square homes, home buyers were to be offered vinyl siding as an option.

*Charles Koehler's Testimony*

At trial Charles Koehler, plaintiff's owner, testified that in the spring or summer of 1990 a concrete contractor had recommended plaintiff to Joseph Knapp, one of defendant's employees. Knapp stopped by plaintiff's office and told Koehler about defendant and the Tiffany Square subdivision for which defendant anticipated building 60 homes. He said that defendant had a couple of siding contractors doing its work, but defendant was not happy with them. Koehler told Knapp about plaintiff's operations. Knapp said he would give Koehler preliminary plans to bid. Koehler thought that Knapp, like most builders, would also get bids from other subcontractors. Knapp sent Koehler plans for four different home styles. On July 26, 1990 plaintiff prepared a proposal for Dutch-lap vinyl siding for these four home styles which he gave to Knapp with some samples.

Knapp said the proposal and prices looked good and asked how much more Triple 3 siding would cost. Koehler told him it would be 9% more and Knapp indicated that price would be fine.

Knapp told Koehler that the subdivision had not broken ground yet. Subsequently, Knapp gave Koehler the names of other subdivisions and asked him to look at the siding installation in those subdivisions and tell him what plaintiff would do differently to avoid some of the problems which had arisen in those subdivisions. After viewing the subdivisions, Koehler told Knapp what he observed and how plaintiff would do the job.

Later Knapp called and told Koehler that defendant was still waiting for the final plans for the Tiffany Square subdivision. In the same conversation Knapp told Koehler that Dennis McReynolds, a friend of defendant's president, was building a home with a plan similar to the plans on which plaintiff had bid and asked Koehler if he would be interested in doing the McReynolds' house. Defendant then sent plaintiff a plan with two elevations on August 9, 1990. Plaintiff submitted a bid to defendant on these elevations. Koehler later found out that these elevations were similar to the McReynolds' home. McReynolds' house was not in Tiffany Square.

Plaintiff started work on the McReynolds' house on August 26, 1990, after Knapp told Koehler to go ahead and told him what plan it was. Koehler first personally dealt with McReynolds when he started work on the house. McReynolds told him what additional options and other work he wanted done and asked him the price of those options. McReynolds' house had a walkout basement, whereas the standard plan was designed for a level lot. As a result, McReynolds wanted additional siding for the exposed portions of the lower level. He wanted a "fish scale" siding on the front, aluminum soffit on the front porch, aluminum cladding on the beams, and foam core insulation. Plaintiff provided all of these extras.

Plaintiff did the siding job at the same cost as it would have done the work for defendant. The basic price was the same it had given defendant. Plaintiff charged cost plus profit and markup on the options and extras. Plaintiff completed the siding on the McReynolds house on September 8, 1990 and billed defendant $7,641.50 on September 10, 1990. On October 24, 1990 Koehler sent defendant a second invoice detailing the prices on all of the extras and options the homeowner had

requested. This bill showed charges of $4,933.00 for siding soffit and facia on the "original plan" and total charges of $2,663.50 for "Extras". When plaintiff was not paid, he called defendant's office. An employee returned his call and advised him of a mistake in the bill, which Koehler corrected, reducing the October 24, 1990 bill to $7,566.50. He called defendant again about getting paid and one of defendant's employees told him that McReynolds was paying the bill. Koehler called McReynolds who told him that the options were more than he thought and he would only pay a flat sum of $6,500. On November 15, 1990 McReynolds paid plaintiff $6,500 by voucher drawn on his escrow account at a title insurance company. $1,066.50 remained unpaid at the time of trial.

In August, 1990, after Koehler had met with Knapp about colors and styles, plaintiff ordered Triple 3 and Dutchlap siding in the most popular colors for approximately 12 homes at a cost of $32,640.25. Plaintiff received the siding on August 30, 1990 and stored it. Koehler ordered the siding because "Mr. Knapp told us we were going to be doing some work for him in Tiffany Square." No houses had yet been built at the subdivision. Plaintiff ordered the materials because he understood that Knapp wanted him to be prepared. He bought the quantity he did to get a discount. Koehler testified that Knapp did not ask him to order ahead of time. He testified that he did not know how many homeowners would order vinyl siding, or what colors, styles or amounts they would choose.

On September 5, 1990 plaintiff received what Koehler termed a "start sheet" for lot 44, a display house. This document was entitled "Tiffany Square Color Selection" and indicated the outside selections for a display house on Lot # 44. After receiving it Koehler talked to Knapp who asked him to break down his proposals on the elevations between Triple 3 and Dutchlap. In October, 1990 Koehler showed Knapp the siding he had ordered. Knapp did not indicate that there was a problem. Koehler submitted a second proposal for Tiffany Square on October 25, 1990 which reflected more elevations, differ-

ent styles and a breakdown for Triple 3 siding. At the end of October or beginning of November, Koehler went to Tiffany Square development after unsuccessfully telephoning Knapp. He noticed display homes had been started and a siding crew was working on one house. Koehler testified Knapp apologized and said a mistake had been made at the office, that the employees had sent out the old contractors, and that defendant would let him do houses in another subdivision.

On about November 5, 1990 plaintiff received a payment schedule from defendant addressed "to whom it may concern" which showed payment scheduling for six of defendant's subdivision developments, including Tiffany Square. Plaintiff never supplied or installed siding on any of the Tiffany Square homes.

*Joseph Knapp's Testimony*

Plaintiff also called Joseph Knapp as a witness. Knapp testified that he told Koehler that plaintiff would be hired as one of the Tiffany Square subcontractors, however, two other subcontractors ended up doing the work. He did not have written contracts with the subcontractors but testified that the contract is established when defendant sends the subcontractor a color selection sheet and the superintendent calls the subcontractor and orders the material.

On January 20, 1991, plaintiff filed this action. In Count I of his first amended petition he alleged the contract as follows:

On or about the 23rd day of July, 1990, Plaintiff and Defendant entered into an oral contract whereby Plaintiff for consideration, was to install exterior siding on certain subdivision homes, including displays.

\* \* \* \* \* \*

That on or about August, 1990, Defendant engaged the services of Plaintiff and thereafter, in reliance upon the agreement, Plaintiff ordered sufficient siding to complete twenty (20) homes.

In Count II he alleged that contract as follows:

Plaintiff and Defendant discussed and agreed upon the prices for said services

and thereafter Plaintiff provided siding to a home at 1936 Boaz in Kirkwood. A copy of the invoice reflecting the cost of the siding and installation is set forth in Exhibit "A".

\*    \*    \*    \*    \*    \*

Plaintiff provided the goods and services set forth in Exhibit "A" and performed same in a workmanlike manner.

■ For its first point, which is dispositive, defendant asserts that the trial court erred in overruling its motion for judgment notwithstanding the verdict because plaintiff failed to make a submissible case on the existence of a contract in either count one or count two.

■ To make a submissible case, substantial evidence must support every fact essential to liability. *Eidson v. Reproductive Health Services*, 863 S.W.2d 621, 626 (Mo. App.1993). "Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of facts can reasonably decide a case." *Hurlock v. Park Lane Medical Center, Inc.*, 709 S.W.2d 872, 880 (Mo.App.1985). The questions of whether evidence in a case is substantial and whether the inferences drawn are reasonable are questions of law. *Id.*

■ In determining whether plaintiff has made a submissible case, we view the evidence in the light most favorable to it. *Eidson*, 863 S.W.2d at 626. We presume plaintiff's evidence is true and give plaintiff the benefit of all reasonable and favorable inferences to be drawn from the evidence. *Id.* However, we do not supply missing evidence or give plaintiff the benefit of unreasonable, speculative, or forced inferences. *Id.* The evidence and inferences must establish every element and not leave any issue to speculation. *Id.*

■ Plaintiff is bound by the uncontradicted testimony of plaintiff's own witnesses, including that elicited on cross-examination. *Hurlock*, 709 S.W.2d at 879. Where plaintiff has called a witness who comes within the adverse witness rule, plaintiff is bound by that witness's testimony on direct examination if the testimony is uncontradicted or is the only testimony on the subject; however, an adverse witness's testimony on cross-examination is not binding on plaintiff. *Id.*

■ To establish a submissible case of breach of contract, a plaintiff must first establish the existence of an agreement. In order for a contract to be formed, the parties must mutually assent to its terms. *Douros Realty & Constr. Co. v. Kelley Properties, Inc.*, 799 S.W.2d 179, 182 (Mo.App.1990). The nature and extent of the contract's essential terms must be certain or capable of being certain. *Id.* If the parties have. reserved the essential terms of the contract for future determination, there can be no valid agreement. *Around The World Importing, Inc. v. Mercantile Trust Co., N.A.*, 795 S.W.2d 85, 90 (Mo.App.1990).

■ Negotiations or preliminary steps towards a contract do not constitute a contract. *Cervantes v. Ryan*, 799 S.W.2d 111, 116 (Mo.App.1990). The existence of a contract necessitates a "meeting of the minds" which the court determines by looking to the intention of the parties as expressed or manifested in their words or acts. *Brand v. Boatmen's Bank of Cape Girardeau*, 824 S.W.2d 89, 91 (Mo.App.1992). Whether a contract is made and, if so, what the terms of that contract are, depend upon what is actually said and done and not upon the understanding or supposition of one of the parties. *Bare v. Kansas City Federation of Musicians Local 34–627*, 755 S.W.2d 442, 444 (Mo. App.1988).

*Count I*

Plaintiff's evidence was insufficient to establish the existence of a valid and enforceable contract in count one. Plaintiff alleged the agreement was that it would "install exterior siding on *certain* subdivision homes, including displays." (emphasis added) However, there was no evidence of an agreement, definite in terms, between the parties that plaintiff would provide siding and defendant would compensate plaintiff for siding on any house in Tiffany Square subdivision. Plaintiff contends the contract was established by its proposal and Knapp's representation that plaintiff would be one of the subcontractors

on the job. However, these do not indicate mutual intent to contract. Plaintiff supplied bids for vinyl siding on various models of homes which defendant was going to offer home buyers. However, at that time the parties did not know which colors or types of siding the home buyers would choose or how many home buyers would choose siding. Further, there was no evidence that plaintiff would be the only siding contractor in this subdivision. If an agreement is unduly uncertain and indefinite, no contract is formed. *Around the World,* 795 S.W.2d at 90.

Plaintiff argues that any indefiniteness is due to the nature of the job, relying on *Marshall v. Edlin,* 690 S.W.2d 477 (Mo.App. 1985). It contends that even if the amount of labor and material was unknown, defendant could agree to engage defendant's services to side the Tiffany Square homes. *Marshall* does not apply. In *Marshall,* the parties orally agreed that the plaintiff would combine the defendant's *entire* crop. The parties knew how many acres would be planted. Although the exact starting date could not be precisely agreed upon and the exact number of acres to be harvested could not be predetermined because of weather conditions, "the terms of the agreement were as definite as the nature of the work would permit." *Id.* at 480. However, in this case, there was only a representation that plaintiff would do *some* work in Tiffany Square. There was no agreement that plaintiff would exclusively side the *entire* subdivision or even all of the houses on which vinyl siding was ordered. Plaintiff has proved only a proposal for a contract or contracts, but it has not proved essential terms of any completed contract. The number of homes to be sided was not only unknown, but also defendant had not agreed that plaintiff would be the subcontractor on any particular home or on all homes to receive vinyl siding. Plaintiff did not make a submissible case on the contract alleged in Count I.

*Count II*

■ Plaintiff has also failed to make a submissible case on the existence of a contract with defendant to provide siding to the McReynolds house, as alleged in Count II. Although plaintiff dealt with one of defendant's employees in establishing a base price and starting the work for the house, plaintiff knew the owner's existence and furnished the work and materials to the home. Plaintiff did not put on any evidence that Knapp represented that defendant had agreed to pay for the siding or would guarantee the owner's payment for the siding. Koehler testified: "In construction, a lot of times the builders don't always pay the bill. The homeowners decide to pay the bills. Either the builder pays or the home owners sign the bills."[1] Further, plaintiff did not put on any evidence that defendant ordered or agreed to the extras. McReynolds told Koehler what options and additions he wanted which were not on the standard plan. Koehler gave McReynolds prices on these options and then provided the extras McReynolds requested. The fact that plaintiff initially billed defendant for the work was a unilateral act and does not establish an agreement. Plaintiff subsequently contacted McReynolds when he was informed that McReynolds was paying the bill. Koehler accepted payment from McReynolds and, according to the voucher, provided a lien waiver. The disputed amount which plaintiff sought to recover at trial concerns the extras ordered by McReynolds. Plaintiff did not make a submissible case on Count II.

The judgment of the trial court is reversed and the case is remanded for entry of judgment in favor of defendant.

KAROHL and CRAHAN, JJ., concur.

---

1. Although Koehler testified that the practice was that either the builder or the homeowner would pay the bills, Koehler did not present evidence that defendant built the McReynolds home. He thought defendant was the builder, but testified he did not know because there were no other workmen on the site when he sided the house.