L.B., Respondent,

v.

STATE COMMITTEE OF
PSYCHOLOGISTS,
Appellant.

No. WD 50656.

Missouri Court of Appeals,
Western District.

Oct. 31, 1995.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Dec. 5, 1995.

Application to Transfer Denied
Jan. 23, 1996.

Before SPINDEN, P.J., and
BRECKENRIDGE and SMART, JJ.

## ORDER

Jeremiah W. (Jay) Nixon, Atty. Gen., Amy Elizabeth Randles, Asst. Attorney General, Jefferson City, for Appellant.

Kent L. Brown, Jefferson City, for Respondent.

Before FENNER, C.J., P.J., BERREY, J. and TURNAGE, Senior Judge.

FENNER, Chief Judge.

The State Committee for Psychologists ("the Committee") appeals the Order of the Circuit Court of Cole County granting a permanent injunction against the Committee from filing a complaint with the Administrative Hearing Commission ("AHC") in order

to establish cause to discipline the license of L.B.

In September 1989, the Committee received a complaint alleging that L.B. engaged in a sexual relationship with a patient, and that during that relationship the patient had twice attempted suicide. Though the conduct occurred from 1980 through 1983, it was alleged that the patient was not psychologically strong enough to file a complaint until 1989. The complaint suggested that during individual therapy with this patient, L.B. repeatedly hugged and kissed her, held her on his lap, fondled her, and ultimately invited her to his home where they engaged in sexual intercourse. A subsequent investigation by the Committee allegedly revealed that L.B. had engaged in sexual relationships with at least one other private practice patient and with at least three of his students or supervisees at Southwest Missouri State University.

When L.B. learned of the charges against him, he requested copies of the Committee file and an opportunity to meet with the Committee. Shortly thereafter, L.B. appeared informally before the Committee and offered evidence to refute the allegations. Counsel for L.B. indicated on numerous occasions his client's desire to avoid the filing of a formal complaint with the AHC and solicited settlement offers from the Committee.

The Committee responded on June 28, 1991, with an offer of settlement that recited some of the facts possessed by the Committee concerning L.B.'s conduct. Under the terms of this initial offer, L.B.'s license would be suspended for two years followed by a four year probationary period. During the period of suspension, L.B. was not to engage in "any counseling, guidance, psychotherapy or acts which fall under the definition of the term psychology as set forth in §§ 337.015.3 and 337.015.4, RSMo 1989, whether license is required for such acts or not." The proposal also provided that during the period of suspension and probation, "the scope and nature of [L.B.'s] practice as a professional psychologist will be under review by the State Committee of Psychologists" and that L.B. could not "work in settings that increase the [L.B.'s] risk for sexual misconduct." Further, the proposed agreement specifically stated that "[L.B.'s] work setting must be approved by the State Committee of Psychologists" during the period of suspension and probation. Finally, the proposed agreement required L.B. to notify his patients that his license was under probation during such period, including written verification from each patient of such notification, and prevented L.B. from serving as a supervisor for any psychological trainee, intern, resident, assistant, or any person under supervision during the course of obtaining licensure as a psychologist, professional counselor, or social worker.

The Committee provided specific instructions for acceptance of the initial offer. L.B. was to sign on the space provided on the last page of the document and return it to the Committee, with the agreement taking effect on the date the Committee added its signature to the document. The Committee also provided a July 15, 1991 deadline for acceptance of the offer. L.B. did not accept this offer.

Counsel for L.B. responded to the initial offer of settlement by letter dated July 8, 1991, stating that he had reviewed the proposal with his client, and "[a]fter reviving him, [told] him that this was just the starting point of discussions toward possible settlement...." The letter continued, with L.B. proposing to settle the claims against him by agreeing not to contest certain charges in return for a probationary period retroactive to the date of the alleged violations "solely to get [the] matter concluded without any additional legal and emotional expense." Another letter followed from counsel for L.B. on July 12, 1991, indicating his understanding that the proposal set forth by L.B. in the July 8th letter was being submitted to the Committee for consideration.

A meeting between counsel for each party apparently occurred on July 31, 1991 (it is unclear whether L.B. or a representative of the Committee was in attendance at this meeting). Counsel for the Committee followed up this meeting with a letter on the same date, stating the following:

[M]y understanding of [L.B.'s] "counteroffer" to be considered by the State Committee of Psychologists ... is as follows:

[L.B.'s] psychologist license be [sic] suspended for two (2) years followed by five (5) years probation. The period of suspension is stayed or suspended subject to [L.B.'s] successful completion of the five year probation period.

In addition, [L.B.] agrees to all of the terms of discipline as set out in the original offer ... except for [the requirement] that he inform his clients/patients that he is under probation with the Committee.

Counsel for the Committee requested that L.B. notify her if any part of her understanding was incorrect.

Counsel for L.B. responded by letter dated August 1, 1991. The substance of this response is as follows:

Just so there is no misunderstanding, what I would recommend to [L.B.] to resolve this complaint is as follows:

1. He would not contest a violation consistent with his testimony before the [Committee].... The wording must be such so as to make clear he denies all charges and will not contest this one violation only to conclude the matter and avoid additional legal expenses. All other charges would be dismissed.

2. The imposition of any suspension of his license would be suspended pending successful completion of a five-year probationary period.

.    .    .    .    .

4. During this five-year probationary period he would not supervise post-masters or post-doctoral students for licensure purposes.

How the preceding plugs into terms A through O on pages 15 through 19 [excepting the term requiring him to notify his patients of his suspension and receive a written verification of such notification] would seem to be just a matter of wording.

It appears from the record that no further written communications occurred between the parties until October 1991.

On October 18, 1991, counsel for the Commission informed L.B. that the Commission had voted to provide a counteroffer in an attempt to reach a consent agreement (necessarily implying that L.B.'s offer of settlement had been rejected). The counteroffer consisted of two alternative terms:

1. Agree to suspend imposition of sentence and five years probation. The agreement would include allegations involving the dual relationship with [client 1] and the bartering relationship with [client 2], an attorney (who was also a patient); OR

2. Agree to a two year suspended execution of sentence with five years probation, but include only the allegation of the relationship with [client 1].

This offer was also unacceptable to L.B. On November 15, 1991, a letter from L.B.'s counsel to counsel for the Committee provided a new counteroffer of settlement:

[L.B.] would enter into an agreement by which he does not contest, although he also does not admit any liability for, the charge relating to his relationship with [client 1]; imposition of any discipline, particularly any suspension, would be suspended and in essence he would serve a probationary period of five years.

The details and exact wording of the ultimate agreement need to be worked out but I believe ... we understand our respective positions and will be able to draft an appropriate agreement accordingly.

The letter concluded with L.B. expressing his hope to have the matter concluded by the end of the year. At this point, there is no indication from L.B. that he objected to provisions requiring Committee approval of his work setting.

On December 20, 1991, counsel for the Committee wrote L.B. and informed him that his latest counteroffer had been rejected and that the previous offer of the Committee was being re-extended. L.B. responded by letter dated January 13, 1992, that does not expressly reject or accept the Committee's offer, but lays out further concerns with the settlement as proposed:

As to some of the other details, I would make the following observations preliminary to getting together to try to work out the total agreement:

1. The allegations which he will not contest are those as to [client 1], his current wife, who actually was a supervisee and not a student of his. This distinction is important because of his continuing relationship with the college, one which he does not want affected by the disposition herein.

2. As a result of this concern expressed above, execution of the final agreement will be conditional upon review and confirmation by the college that it will in no way jeopardize his position there.

3. All other pending complaints will be dismissed with prejudice and no existing complaints may serve as a basis for a claim that the terms of probation had been breached.

4. The agreement and terms of probation shall not be construed to take away any other legal rights [L.B.] might have.

    .     .     .     .     .

6. The general terms of the agreement would be couched along the lines of my letter of October 18, 1991.

This is the first occasion on which L.B. mentioned needing to clarify the terms of the agreement so that he would not jeopardize his position at the college. There is still no mention of any concern with the terms of the agreement requiring general approval by the Committee of any work setting L.B. desired to work in.

The Committee responded by forwarding a written, proposed consent agreement to L.B. on February 28, 1991. The proposal set out the agreement in full detail and requested a response by March 11, 1992. At this point, it appears that a dispute arose regarding the required Committee approval of any work setting in which L.B. intended to practice. Apparently, L.B. was under the impression that his private practice would continue unrestrained during the probationary period, while the Committee contended that it must approve the setting of any professional psy-

chological practice L.B. desired to undertake. In his letter from counsel dated May 5, 1992, L.B. states:

This is to follow-up our telephone conversation of May 4, 1991, regarding the *possible* compromised disposition of the complaint against [L.B.].

I again have gone through my entire file, particularly the correspondence between your office and mine, and still am at a loss as to how this apparent misunderstanding occurred. None of those communications suggest that [L.B.] should not be permitted to continue his private counseling during the probationary period—provided, of course, that he complies with the terms of the probation.

    .     .     .     .     .

I again would strongly urge the Committee to reconsider what you indicate is its current position, i.e., that discontinuation of his private practice is now a non-negotiable term. Nothing has happened that even suggests less than exemplary conduct by [L.B.] during the intervening years since the alleged conduct in the complaint. It would seem unfortunate for such an obviously unacceptable barrier to suddenly arise when it appeared that the road to settlement was essentially paved and needed only the detailed markings to be completed.

    .     .     .     .     .

Hopefully, none of these many issues will need to be litigated because I still am optimistic that all of the good work that has taken place thus far will not go for naught and that a mutually satisfactory resolution of the complaints *can be achieved.*

This letter was followed by a letter from L.B.'s counsel dated May 26, 1992, that states:

[W]e have believed for some time, and continue to believe, that an agreement was struck long ago on the disposition of these allegations and that the last minute addition of the condition that the licensee give up his private practice violates that agreement, is totally unsupported by the correspondence and the proposed settlement

agreements and suggests an abuse of the licensing process.

This was the first mention in any correspondence from L.B. of the belief that an agreement had been struck "long ago."

The Committee responded by letter dated May 27, 1992, pointing out the fact that the term requiring L.B.'s work setting to be approved by the Committee was a part of the original written proposal dated June 28, 1991, that served as the beginning point and basis of settlement negotiations. The letter further clarified that the term was not a last minute addition and that it was never represented to L.B. as being negotiable. The letter also pointed out that the only work setting ever inquired about by L.B. was his desire to continue teaching, which was addressed and approved by the Committee. Finally, the Committee pointed out that "[i]n light of the risk for sexual misconduct in a private practice setting, the Committee never intended to allow L.B. to practice in a private setting while on probation."

On June 10, 1992, the Committee informed L.B. that it had rejected his latest offer of settlement—that he inform his patients that he was on probation with the Committee if the Committee allowed him to continue in private practice during the disciplinary period—and re-extended the prior written offer contained in its February 28th correspondence until June 29, 1992.

L.B. did not sign and return the re-extended offer as provided; consequently, this offer was also deemed rejected. The Committee announced its intent to file charges against L.B. with the AHC. Before such action could be taken, however, L.B. filed suit in the Circuit Court of Cole County seeking to enjoin the filing of charges and compel specific performance of a settlement agreement entered into by the parties, which he claims was entered on August 1, 1991. The court granted L.B.'s request for a temporary restraining order and subsequently issued temporary and permanent injunctions against the Committee, preventing the Committee from filing a complaint against L.B. with the AHC to establish cause to discipline the license of L.B. "based on the investigation presently pending." None of the orders is-

sued by the trial court identified the language, meaning, or effective date of the agreement allegedly entered into by the parties. This appeal followed.

## I.  **STANDARD OF REVIEW**

An action seeking an injunction is by nature an action in equity. The standard of review in a court-tried action in equity is well established: the trial court's judgment will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976); *Perry v. Spavale,* 828 S.W.2d 709, 711 (Mo.App.1992). This court will only reverse the circuit court's final injunction order on the grounds that it is against the weight of the evidence with caution and a firm belief that the decree or judgment is wrong. *Murphy,* 536 S.W.2d at 32.

## II.  **WAS THERE A SETTLEMENT AGREEMENT?**

L.B. alleged in the circuit court that he and the Committee entered into a contract to settle the charges against him on August 1, 1991, and that the terms of that contract were embodied in the proposed agreement mailed to his attorney on February 28, 1992. L.B. claims that the language of the agreement allowed him to engage in private practice during the term of his probation, regardless of whether the Committee had approved the work setting. Finally, L.B. claims that because the alleged agreement was intended to be a final settlement of all the charges which had been brought to the Committee's attention as of February 28, 1992, the Committee is precluded from filing an action before the AHC based upon the allegations in those complaints.

L.B. sought to enforce the terms of a compromise settlement in the circuit court. A compromise settlement is a contract. *Randall v. Harmon,* 761 S.W.2d 278, 279 (Mo.App.1988). In order for the compromise settlement to be legally valid, it must possess the essential elements of any other contract.

*Id.* The essential elements of an enforceable contract are parties competent to contract, a proper subject matter, legal consideration, mutuality of agreement, and mutuality of obligation. *Computer Network, Ltd. v. Purcell Tire & Rubber Co.,* 747 S.W.2d 669, 675 (Mo.App.1988); *Bengimina v. Allen,* 375 S.W.2d 199, 202 (Mo.App.1964).

Though the issue of whether there was proper subject matter to contract is raised by the parties in light of the recent Missouri Supreme Court decision in *Bodenhausen v. Missouri Board of Registration for the Healing Arts,* 900 S.W.2d 621 (Mo. banc 1995),[1] decided during the pendency of this case, the issue of mutuality of agreement disposes of this case. Since we find that there was no binding agreement between the parties we need not address the question of whether the parties had authority to enter into a binding agreement under *Bodenhausen.*

The term "mutuality of agreement" implies a mutuality of assent by the parties to the terms of the contract. The nature and extent of a contract's essential terms which form the basis of the parties' mutual assent must be certain or capable of being certain. *Gateway Exteriors, Inc. v. Suntide Homes, Inc.,* 882 S.W.2d 275, 279 (Mo.App.1994). If the parties reserve any of the essential terms of the purported contract for future determination, there is no valid, binding agreement. *Id.*

Especially relevant to this case is the concept that negotiations or preliminary steps towards a contract do not themselves constitute a contract. *Id.; Cervantes v. Ryan,* 799 S.W.2d 111, 116 (Mo.App.1990). The existence of a contract necessarily implies that there has been a "meeting of the minds" between the parties which the court can determine by looking to the intentions of the parties as expressed or manifested in their words or acts. *Gateway Exteriors,* 882 S.W.2d at 279; *Brand v. Boatmen's Bank of Cape Girardeau,* 824 S.W.2d 89, 91 (Mo.App. 1992). *"Whether a contract is made and, if so, what the terms of the contract are, depend upon what is actually said and done and not upon the understanding or supposition of one of the parties."* *Gateway Exteriors,* 882 S.W.2d at 279; *see also Bare v. Kansas City Federation of Musicians Local 34–627,* 755 S.W.2d 442, 444 (Mo.App.1988).

Also important to the analysis of this case is the principle that a contract is not complete until the proposition of one is presented to the other and accepted as presented. *Randall,* 761 S.W.2d at 279; *Revere Copper & Brass v. Manufacturers' Metals & Chemicals,* 662 S.W.2d 866, 870 (Mo.App. 1983). The acceptance of a proposition presented by one party must be accepted by the other in the form tendered; if the acceptance purports to add or alter the proposition made, then neither party is bound. *Id.*

We believe the record clearly reveals that there was no mutual assent as to the terms of a proposed settlement agreement between the Committee and L.B. Though L.B. contends an agreement was struck as of August 1, 1991 (and embodied in the written agreement presented to him for approval and signature on February 28, 1992), this contention is contrary to the overwhelming weight of the evidence.

On August 1, 1991, counsel for appellant did write to counsel for the Committee and explain the terms under which he would *recommend* settlement. A recommendation is not indicative of an agreement which has all of the essential terms finalized.

1. In *Bodenhausen,* a licensee and the State Board of Registration for the Healing Arts had *signed an agreement stipulating* that the licensee violated particular sections of the Healing Arts Practice Act and disciplining his license. No complaint was ever filed with the AHC for a determination of whether cause existed to discipline Bodenhausen's license. Much like the alleged agreement in the case at bar, the Bodenhausen agreement was *entered into in lieu of* proceedings before the AHC. The State Board took the position that a determination of cause to discipline by the AHC was not necessary in order to enter such an agreement (like the Committee's position in this case until the release of the *Bodenhausen* decision). The Missouri Supreme Court declared that because administrative agencies possess only those powers expressly conferred or necessarily implied by statute, *State ex rel. 22nd Judicial Circuit v. Jones,* 823 S.W.2d 471, 476 (Mo. banc 1992), the State Board of Registration for the Healing Arts could discipline a physician's license by settlement agreement *only* if the AHC *first* found cause for discipline.

On October 18, 1991, counsel for the Committee advised L.B., through counsel, that they were submitting a counteroffer. By adding terms or altering terms of an original settlement offer, a party makes a counteroffer and rejects the original offer. *Randall*, 761 S.W.2d at 280; *see Londoff v. Conrad*, 749 S.W.2d 463, 465 (Mo.App.1988). It is unreasonable for L.B. to allege that an agreement was struck as of August 15, 1991, when it is abundantly clear that the Committee did not assent to the proposed terms of his offer when they submitted a counteroffer.

This was not an isolated indication of the absence of the agreement alleged by L.B. L.B.'s intentions as expressed in the words and acts of he and his attorney indicate that there had not been a "meeting of the minds" between the parties regarding the alleged settlement agreement:

* A letter from L.B.'s counsel to counsel for the Committee dated November 15, 1991, indicating that the October 18th counteroffer was unacceptable and providing a new counteroffer from L.B.

* A December 20, 1991 letter from the Committee's counsel to L.B.'s counsel indicating that L.B.'s November 15th counteroffer had been rejected by the Committee and renewing the Committee's October 18th offer of settlement.

* A January 13, 1992 letter from L.B.'s counsel that indicates neither acceptance nor rejection of the renewed offer from the Committee, but does express concerns about the language of the settlement as proposed, makes "observations *preliminary* to getting together to *try* and work out a total agreement," and conditions execution of the "final agreement" on approval by the college that L.B.'s teaching position would not be jeopardized by the disciplinary action.

* After the dispute arose over the provision of the settlement requiring Committee approval of his work settings, a provision that was in the original proposed agreement and a provision that L.B. did not question at any time until after the second written agreement was submitted for his approval, counsel for L.B. wrote to counsel for the Committee "regarding the *possible* compromised disposition of the complaint against [L.B.]" and stating that he was "optimistic that ... a mutually satisfactory resolution of the complaints *can be achieved.*"

If anything, these communications, including those from L.B., make it explicitly clear that negotiations continued but there was no mutual assent as to all of the essential terms between the parties and that an agreement had not been reached.

Further, when L.B. first indicated on May 26, 1992, that he believed an agreement had been "struck long ago," he again voiced his displeasure with the condition that limited L.B.'s private practice, stating that it was unsupported by the correspondence and proposed settlement agreements and added at the last minute. This position is wholly unsupported by the record, as the original proposed written settlement agreement sent to L.B. and counsel on June 28, 1991, states the following at section III:

During the period of SUSPENSION and PROBATION ...

E. The scope and nature of [L.B.'s] practice as a professional psychologist will be under review of the State Committee of Psychologists. [L.B.] may not work in settings that increase [L.B.'s] risk for sexual misconduct. [L.B.'s] work setting must be approved by the State Committee of Psychologists.

This exact language in the second written proposed agreement is the "new condition" the Committee tried to impose at the last minute according to L.B. The Committee claims this term is non-negotiable and L.B. refused to accept such a term. Additionally, given the nature of the charges and purpose of the intended discipline, L.B.'s contention that the alleged settlement agreement allowed him to continue his private practice without restraints is unreasonable and unduly minimizes the claims made against him. Because the issue of the Committee's supervision of L.B.'s practice was an essential term of the proposed settlement agreement, it is clear there was no mutual assent between the parties as of August 1, 1991, as alleged by L.B.

Finally, when the Committee submitted the second written proposed settlement agreement to L.B., they included a direction that L.B. contact them by March 11, 1992, with his response. As part of the original proposal, the Committee required L.B. to sign the original and return it to the Committee's counsel. Committee counsel would then sign it and have the Committee sign it, at which time an effective date would be placed on the agreement. The second proposed agreement was submitted in the same form as the original. Under Missouri law, an offer that prescribes the mode of acceptance limits the manner in which the offer can be accepted. *Waible v. McDonald's Corp.*, 935 F.2d 924, 926 (8th Cir. 1991); *Cal Caulfield & Co. v. City of Belton*, 687 S.W.2d 207, 209 (Mo.App.1984). If the February 28, 1992, written proposal embodied the agreement of August 1, 1991, as alleged by L.B., then he should have accepted it as prescribed by March 11, 1992. When L.B. did not accept the offer by March 11, 1992, the offer terminated and there was no longer an agreement on the table to accept. Though the Committee eventually renewed the offer, L.B. still did not accept it as prescribed.

We find that the order of the Circuit Court of Cole County granting a permanent injunction against the Committee from filing a complaint with the AHC in order to establish cause to discipline the license of L.B. was in error, as it was against the overwhelming weight of the evidence and we possess a firm belief that the circuit court's judgment was incorrect. After reviewing the record (including the absence of a declaration by the circuit court of the terms of the purported agreement alleged by L.B.), we find little, if any, evidence to support L.B.'s claim that there was a valid, enforceable settlement agreement entered by the parties on August 1, 1991. The order of the circuit court is reversed and the injunction against the Committee is lifted.

All concur.