J.H., Appellant,

v.

Emil BROWN, Respondent.

No. WD 72335.

Missouri Court of Appeals, Western District.

Feb. 8, 2011.

Scott A. McCreight, Michael S. Ketchmark, and Brett A. Davis, Kansas City, MO, for appellant.

Gregory A. Leyh, Gladstone, MO, for respondent.

Before Division Three: CYNTHIA L. MARTIN, Presiding Judge, GARY D. WITT, Judge and ZEL M. FISCHER, Special Judge.

CYNTHIA L. MARTIN, Judge.

This appeal arises out of a breach of contract action filed by J.H. to enforce a settlement agreement between J.H. and Emil Brown ("Brown"). Following a bench trial, the circuit court entered a judgment in favor of Brown, finding that an enforceable settlement agreement had not been reached. On appeal, J.H. con-

tends that the trial court erred because she established by clear and convincing evidence that the parties had agreed to all of the essential terms of settlement. We affirm.

## Statement of Facts and Procedural History

J.H. alleged that Brown sexually assaulted her in January of 2007.[1] At the time of the alleged assault, Brown was under a one-year, non-guaranteed, contract with the Kansas City Royals ("Royals").

On January 23, 2007, J.H.'s counsel, Michael Ketchmark ("Ketchmark"), sent Brown a demand letter, which provided that J.H. would "accept $575,000.00 in exchange for a full settlement and release of her claims." The letter advised that if a settlement agreement could not be reached, J.H. would file suit, thus publicizing her allegations. Brown, fearful that any negative press before the April 2, 2007 home opener would jeopardize his compensation,[2] hired Gregory Leyh ("Leyh"). Leyh contacted Ketchmark, and the parties agreed to mediate the dispute. Richard Ralston ("Ralston") was selected as the mediator.

On March 6, 2007, the parties participated in mediation. The dispute was not resolved at that time. The parties continued to negotiate.

On March 23, 2007, Ralston advised Leyh that if J.H. did not have a signed settlement agreement by the end of next week, she intended "to go public. Apparently, [Ketchmark] is getting pressure from [J.H.]. Let me know what is going on. Opening Day is not far off." Leyh re-

sponded that day in an email to Ralston stating, in pertinent part:

[T]he sticking point as I remember it is the form of [J.H.'s] letter. The letter needs to say: At no time did Emil Brown ever harm or threaten to harm me, and I am sorry that I ever made it sound as if I was harmed [this is almost word for word what she told Detective Miller]. On each occasion that I had sex with Emil Brown, I consented to the sex with him. Any statements suggesting that Emil Brown coerced me to have sex or raped me are false.

As you know, the language in her letter is critical. If [J.H.] is going to get the money she demands, she needs to provide fair protection to Brown so he doesn't have another extortionate hand in his pocket soon. We see this deal as a pay off [sic] to two extortionists. We only want to make one payment, not two or three. The letter is necessary to accomplish that.

Plus confidentiality agreement. It is my understanding that [J.H.] refused to include a liquidated damages/penalty provision. Payments are to be staggered so that the final payment (15k) comes after Brown's next contract is negotiated.... The rest of the money should be paid in modest increments (10–20k) between date of settlement and March 1, 2008. I ... think this is where we were before I left. Let me know if we have a deal. We appreciate your continued help.

On March 26, 2007, Ketchmark emailed a settlement offer to Leyh. The terms of the offer were as follows:

1. Complete mutual release of all parties and attorneys with confidentiality provisions.

---

**1.** The specific allegations are not pertinent to the appeal.

**2.** In 2007, Brown's projected salary was $3.45 million. However, Brown's contract

provided that if he was released for any reason within the fifteen days preceding the home opener, he would only receive one fourth of this salary.

2. Emil Brown makes a $100,000 settlement payment. $70,000 delivered to Davis, Ketchmark & McCreight law firm (two checks as designated by plaintiff's counsel) by April 9, 2007 and $30,000 delivered to Davis, Ketchmark & McCreight law firm on the earlier of two dates March 1, 2008 or 10 calendar days after Emil Brown Signs a baseball contract (if any) for next year.

3. [J.H.] will sign a letter stating:

'I voluntarily dropped the charges of assault and rape against Emil Brown and I told the police department that Emil Brown did not harm me in anyway and that I did not want to pursue criminal charges. I also told the police department that all interaction between Emil Brown and I were consensual.'

4. [J.H.] will not make any statement about this dispute other than the statement contained in paragraph 3 above.

5. Emil Brown pays for the cost of mediation.

6. The parties agree to sign and exchange the necessary paperwork, and Emil Brown will provide the first settlement checks no later than April 9, 2007. Emil Brown will pay an extra $100 a day for every day that the settlement checks are delayed after April 9, 2007. The same $100 a day will apply for each day the second settlement check is delayed as well.

7. We need the consent from Emil Brown, via his counsel, that the above settlement terms are acceptable by no later than the close of business on March 28, 2007.

*If the above conditions are unacceptable we are still prepared to file suit on March 29, 2007.*

(Emphasis added.)

Leyh requested that he be given until March 30, 2007, to respond to J.H.'s offer, as Brown was in spring training. Ketchmark agreed. On March 30, 2007, Leyh responded to J.H.'s settlement offer providing, in pertinent part, as follows:

- ¶ 1 of the email demand is acceptable, *assuming that the parties and their lawyers can agree on the language of the releases and confidentiality provisions, and assuming no unreasonable delays by Ketchmark or [J.H.].* [Emphasis added.]

- ¶ 2 of the email demand is acceptable, assuming that the designation of payees is made no later than April 2, 2007.

- ¶ 3 of the email demand is acceptable. Although it is a close call, it is probably better for [J.H.'s] statement to be grammatically correct. To that end, she should say 'I also told the police department that all interactions between Emil Brown and *me* were consensual.'

- ¶ 4 of the email demand is acceptable.

- ¶ 5 of the email demand is acceptable.

- 9 The first sentence of ¶ 6 is duplicative of ¶¶ 1 and 2 and is therefore ignored. Mr. Brown *does not agree* to the punitive provision relating to a payment of $100 per day in the event settlement checks are delayed.

If Mr. Brown's generous offer of settlement is not accepted his accuser will face serious jeopardy.

On April 2, 2007, Ketchmark responded to Leyh's March 30, 2007 letter as follows:

The parties have reached a settlement based upon the terms of the attached email and your acceptance letter. It is important, however, that your client understands that in the event he breaches the timely payment provisions of the agreement, we will file suit for breach of contract and the confidentiality provisions of the agreement will not apply.

... Please e-mail me an electronic draft of the release as soon as possible. We will make any suggested changes electronically and email the release back to you for review.

Leyh responded by facsimile on the same day, and stated:

I received your letter this morning. Your threat of a breach of contract suit is, to paraphrase Bob Uecker, "just a bit premature."

Your client's ability to sue for breach of contract—and the related issue of the applicability of the confidentiality provisions—will turn significantly on the language of the release and settlement contract, don't you think? Since I haven't drafted them yet, I shall disregard your empty threat as more smoke.

Ketchmark responded to Leyh's facsimile with a letter dated April 2, 2007, which provided:

You are missing the point. We are concerned about your client's ability to make the scheduled payments. We attempted to address this issue by setting forth a liquidated damages provision of $100 a day. This is not a punitive provision. Rather, it was a liquidated damage clause designed to encourage Mr. Brown to abide by his contractual obligations. You rejected this provision.

As a result, *the only way we have a deal is if the confidentiality provisions of the agreement you are drafting make it clear* that if [J.H.] is required to file any legal action to enforce the payment provisions of the settlement (i.e. the payments are not made as scheduled), then the confidentiality provision of the agreement does not apply to such a Court action.

(Emphasis added.)

On April 4, 2007, Leyh emailed Ketchmark a draft of a proposed settlement agreement. The draft provided that: "The parties acknowledge that a delay in receipt of payments of ten days or less is not considered unreasonable, and shall not be the basis for any action to enforce the terms of this Agreement." The draft imposed an obligation to mediate in the event of a claimed payment default as a condition to J.H. filing a lawsuit to enforce the agreement. The draft also indicated that if any subsequent suit was filed by J.H. for breach of contract that she would agree to seal the proceedings "in order to protect Brown's good name, reputation and privacy." The draft did not include a liquidated damages provision or the alternative provision required by Ketchmark negating the confidentiality clause should Brown fail to timely make a payment.

On April 5, 2007, Ketchmark's firm sent Leyh an email attaching a revised draft of the settlement agreement, asking that Leyh "review and forward any comments." The revised draft deleted the language proposed by Leyh, which had stated that a delay in payment of ten days or less would not be the basis for an action to enforce the agreement. The revised draft modified the confidentiality provision, suggesting language that allowed J.H. to disclose any necessary information to her tax advisors without disclosing Brown's identity, and deleting reference to the fact that Brown was making settlement payments for the principal purpose of avoiding threatened "personal exposure." The revised draft also modified the enforcement and release provision, deleting a mediation requirement as a condition to J.H.'s right to file suit to enforce, and substituting a seven day cure period as a condition to suit, with an agreement not to oppose Brown's motion that the proceedings be sealed (in lieu of the proposed mutual agreement in advance that any lawsuit would be sealed). The revised draft also added a requirement that in the event suit

to enforce the agreement was required, J.H. would be entitled to recover her attorneys' fees and expenses, a subject not previously addressed in the parties' settlement communications.

On April 6, 2007, Leyh advised Ketchmark that he needed to visit with Brown "to go over the settlement and the revisions proposed." Leyh advised that he anticipated receiving the "authority to negotiate the remaining terms in dispute, but probably won't get another draft to you before Saturday afternoon." On the same day, Ketchmark's firm responded that it was fine to send another draft on Saturday, although he was "not certain that any 'negotiating' remains to be done, since the terms we changed were never part of the settlement agreement reached by the parties."

On April 9, 2007, Leyh emailed Ketchmark and attached a revised settlement agreement and cover letter. The letter advised that the attached revised draft of the settlement agreement was "Mr. Brown's final offer of settlement." The letter also advised that Leyh had the initial settlement check in his possession. The letter stated that "[a]lmost all of your proposed revisions [suggested in [J.H.'s] April 5, 2007 draft] are rejected." Leyh did add to the confidentiality provision that J.H. could disclose necessary information to those preparing her tax returns, though the language was narrowed to provide that:

> [a]ll disclosures, however, shall be limited to disclosing the i) fact of a settlement, ii) date of a settlement, and iii) amount of a settlement, and shall not include disclosure of any allegations of wrongdoing made by [J.H.] against Brown, nor any words, descriptions or information regarding the events causing [J.H.] to make her allegations of

wrongdoing against Brown, nor the name of Mr. Emil Brown.

Leyh's cover letter stated that "[i]f your client does not fully execute the attached Settlement Agreement and Release, then please advise your client that Mr. Brown will no longer engage in settlement communications with your law firm."

On April 11, 2007, Ketchmark sent Leyh both an email and a letter. The e-mail provided that "[w]e cannot agree to the language in the "Whereas" you proposed which we struck out of the draft we sent back to you. . . . In addition your attempt to prohibit [J.H.] from discussing this matter on a confidential basis with her tax advisor is inappropriate." Ketchmark then claimed to be invoking the "mediation" provision of the agreement which had been included in Leyh's April 4, 2007 draft as a condition to the right to file suit to enforce, but deleted from Ketchmark's April 5, 2007 draft.

Ketchmark's April 11, 2007 letter asserted that "[t]here is an enforceable settlement agreement between the parties." The next sentence of the letter, however, provided that "[y]our proposed draft is unacceptable." The letter advised that Ketchmark had "attached the revised agreement taking out matters that were not agreed upon. [J.H.] is prepared to sign the agreement as edited."

On April 12, 2007, Ketchmark sent Leyh another letter. In this letter, Ketchmark made no mention of the revised version of the settlement agreement he had sent to Leyh the day before. Instead, Ketchmark advised that J.H. was "officially accepting Mr. Brown's 'final offer of settlement,'" in other words, the version of the settlement agreement tendered by Leyh on April 11, 2007.

On April 13, 2007, Leyh responded with a letter advising that "as of today's date and for the reasons detailed below, the

parties have *not* reached a settlement of the dispute." Leyh closed the detailed letter noting that "[J.H.] currently has made a settlement demand that appears similar to the terms proposed by Mr. Brown on April 9 and rejected by [J.H.] on April 11. As to that demand, I will consult with Mr. Brown and provide a response in due course."

On April 13, 2007, Ketchmark sent Leyh the April 11, 2007 version of the settlement agreement, executed by J.H. Ketchmark stated that Brown should execute the agreement and forward a settlement check.

On April 24, 2007, Ketchmark sent Leyh a letter advising that it was his belief that the parties had reached an enforceable settlement agreement. Ketchmark stated that if Brown did not perform the agreement, he would file suit to enforce the agreement in federal court.

In response, Leyh asked Ketchmark to explain his position that an enforceable settlement agreement had been reached. The attorneys thereafter exchanged correspondence reflecting their fundamental disagreement about whether an enforceable settlement agreement had been reached.

In July of 2008, J.H. filed suit against Brown in the Circuit Court of Jackson County,[3] alleging breach of contract and seeking enforcement of the purported settlement agreement.[4] The matter was tried to the court on February 17, 2010. The parties' communications from January 23, 2007, through April 27, 2007, were received in evidence. Leyh testified that an agreement regarding the language of the

confidentiality provision had always been an essential term of settlement for Brown. Ketchmark testified that he believed the parties reached a settlement agreement on March 30, 2007, "or at least by April 2nd."

On March 10, 2010, the trial court entered a judgment in favor of Brown. The trial court found that an enforceable settlement agreement had not been reached between the parties. The trial court specifically found that the parties were unable to agree on the language of the confidentiality provision which was "particularly important to [Brown]."

This appeal follows.

## Standard of Review

▬ The judgment of the trial court will be affirmed unless it is not supported by the evidence, is against the weight of the evidence, or erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). "The evidence and all reasonable inferences drawn therefrom will be viewed in the light most favorable to the trial court's judgment, and all contrary evidence and inferences are disregarded." *Pride v. Lewis*, 179 S.W.3d 375, 378 (Mo.App. W.D.2005). The trial court determines the credibility of witnesses and is free to believe or disbelieve all or part of witness testimony. *Cross v. Cross*, 318 S.W.3d 187, 190 (Mo.App. W.D. 2010). We assume that the trial court made findings of fact consistent with the judgment issued, particularly where, as here, findings of fact or conclusions of law were not timely requested by the parties. *Pride*, 179 S.W.3d at 378.

---

**3.** J.H. initially filed suit in federal court. The suit was dismissed for lack of diversity jurisdiction.

**4.** *J.H.'s petition did not allege when the parties purportedly reached an enforceable set-*

tlement agreement. J.H. later alleged in her motion for summary judgment that an enforceable settlement agreement was reached on March 30, 2007.

## Analysis

■ In J.H.'s sole point on appeal, she contends that the trial court erred in finding that an enforceable settlement agreement had not been reached between the parties. J.H. argues that she established by clear and convincing evidence that the parties had agreed to all essential terms of the settlement agreement by April 2, 2007. We disagree.

■ Settlement agreements are governed by the law of contracts. *Emerick v. Mut. Benefit Life Ins. Co.*, 756 S.W.2d 513, 518 (Mo. banc 1988). Thus, for J.H. to enforce a purported settlement agreement with Brown, she must first establish that a binding contract existed. *Pride*, 179 S.W.3d at 379. As J.H. was the party requesting enforcement of the purported agreement, it was her burden to prove by clear, convincing, and satisfactory evidence that a settlement agreement had been reached. *Vulgamott v. Perry*, 154 S.W.3d 382, 388 (Mo.App. W.D.2004). Evidence is clear and convincing if it " 'instantly tilt[s] the scales in the affirmative when weighed against the evidence in opposition, [such that] the fact finder's mind is left with an abiding conviction that the evidence is true.' " *Juvenile Officer v. T.S. (In Interest of T.S.)*, 925 S.W.2d 486, 488 (Mo.App. E.D.1996) (citation omitted).

■ " 'A [settlement] contract does not exist without a definite offer and a 'mirror-image' acceptance.' " *Pride*, 179 S.W.3d at 379 (citation omitted). Although it was not necessary for the parties to have reduced their agreement to writing, it was necessary, in order to find an enforceable settlement agreement, that the parties had agreed on the essential terms. *Vulgamott*, 154 S.W.3d at 390.

J.H. contends that three communications established a binding settlement agreement: her March 26, 2007 settlement offer, the March 30, 2007 response from Brown, and the reply to that response sent by J.H. on April 2, 2007. However, these communications do not establish by clear and convincing evidence that the parties had agreed on the essential terms of settlement and, thus, do not establish the existence of a binding contract.

J.H. made an offer on March 26, 2007, which set forth six essential terms of settlement. On March 30, 2007, Brown responded. He accepted some, but not all, of the six essential terms offered by J.H. Brown specifically rejected the daily penalty provision, appearing in paragraph 6 of the settlement offer. Though Brown generally accepted the term requiring a release with confidentiality provisions appearing in paragraph 1 of the settlement offer, he conditioned this acceptance with the requirement that the precise terms of the confidentiality provision and release had to be negotiated and agreed upon. *Tessler v. Duzer*, 309 S.W.2d 1, 2–3 (Mo. App.1958) (stating that if a party indicates certain terms are "considered necessary factors or terms to be embodied in the ultimate contract between the parties," then those terms become essential to the contract such that without mutual assent, there can be no contract). The trial court found that the precise terms of the confidentiality provision were, indeed, a material term of settlement for Brown given the peculiar impact that disclosure of J.H.'s allegations could have on Brown's current baseball contract and on his ability to negotiate future contracts. The trial court's factual finding in this regard is supported by the evidence, and J.H. does not suggest otherwise. In fact, J.H. concedes that the precise terms of the confidentiality provision were an essential term of settlement.[5]

---

**5.** This acknowledgment is evident in J.H.'s brief but was confirmed during oral argu-

Thus, Brown's response to J.H.'s settlement offer was not a "mirror-image" acceptance of the offer in two respects: it rejected the daily penalty provision, and it conditioned any agreement on coming to terms on the precise language of the confidentiality provision. As a result, Brown's March 30, 2007 response to J.H.'s March 26, 2007 settlement offer constituted a rejection of the offer and the extension of a counter offer. *Pride,* 179 S.W.3d at 379 ("Any acceptance that includes new or variant terms from the offer presented amounts to a counter-offer and a rejection of the original offer.").

J.H. responded to Brown's March 30, 2007 counter-offer on April 2, 2007. The April 2, 2007 communication[6] characterized the combination of J.H.'s March 26, 2007 letter and Brown's March 30, 2007 response as a settlement agreement. However, this unilateral characterization is of no independent legal import. *Crestwood Shops, LLC v. Hilkene,* 197 S.W.3d 641, 649 (Mo.App. W.D.2006) (stating that whether an offer has been accepted depends upon "what is actually said and done; it does not depend on the understanding or supposition of one of the parties"). Thus, we look at what was said in the April 2, 2007 communication to determine whether it qualifies as a "mirror-image" acceptance of Brown's March 30, 2007 counter-offer.

The April 2, 2007 communication begins, "[t]he parties have reached a settlement based upon the terms of the attached email and your acceptance letter." Nothing else is said in the communication about the terms of settlement. The balance of the communication states that failure to comply with the settlement will result in a suit for breach of contract being filed and in the confidentiality provision being of no further force or effect. It is unclear whether this language is intended as an acceptance of Brown's rejection of the daily penalty provision set forth in paragraph 6 of J.H.'s March 26, 2007 settlement offer. Even if it could be so construed, we would be left with the fact that a conceded material term—the precise provisions of the confidentiality provision—had not yet been agreed upon. Thus, the April 2, 2007 reply sent by J.H. to Brown, coupled with the March 26, 2007 settlement offer and Brown's March 30, 2007 response to same, did not combine to form a binding settlement agreement.

In fact, the purported "acceptance" of Brown's rejection of the daily penalty provision in the April 2, 2007 communication from J.H. was itself qualified in a manner that materially impacted the precise terms of the confidentiality provision. J.H. advised that in the event Brown failed to make a payment, the confidentiality provision would be of no further force or effect. That this was, from J.H.'s perspective, an essential component in the confidentiality provision was emphasized by J.H.'s later communication to Brown on April 2, 2007.[7] In that communication, J.H. acknowledged Brown's rejection of the liquidated damage provision and advised that in lieu thereof:

> *[T]he only way we have a deal is if the confidentiality provisions of the agreement you are drafting make it clear* that if [J.H.] is required to file any legal action to enforce the payment provisions of the settlement ... then the

ment.

**6.** There were three communications dated April 2, 2007, between the parties. We are here referring to the first of those communications.

**7.** We are now referring to the third of three communications between the parties dated April 2, 2007.

confidentiality provisions of the agreement does not apply to such a court action.

(Emphasis added.) We conclude, therefore, that even if the combined April 2, 2007 communications from J.H. could be construed to have accepted Brown's rejection of the daily penalty provision, they required as a condition to that acceptance express language in the confidentiality provision permitting the provision to be ignored in the event of nonpayment. The April 2, 2007 communications from J.H. to Brown were not, therefore, a mirror-image acceptance of Brown's counter-offer and were, instead, a counter-offer.

Brown tendered a draft settlement agreement on April 4, 2007. The draft did not include in the confidentiality provision the language insisted upon in J.H.'s April 2, 2007 communications. The draft thus did not provide for the release of J.H. from the confidentiality provision should Brown fail to timely make a payment, a provision J.H.'s counter-offer had advised was required as "the only way we have a deal." The subsequent exchange of revised draft settlement agreements from and after April 4, 2007, merely amplifies that the parties never reached an agreement about the precise terms of the confidentiality provision, a term conceded by J.H. to be an essential term of the settlement. These continued negotiations culminated with Brown sending a "final offer" of settlement on April 9, 2007. The "final offer" was rejected by J.H. on April 11, 2007, when a revised draft of the settlement agreement, including revisions to the confidentiality provision, was tendered as a counter-offer. Although J.H. then attempted on April 12, 2007, to accept Brown's "final offer," and to thus ignore the intervening counter-offer she had extended, once an offer is rejected, it cannot later be accepted. *Nelson v. Baker*, 776 S.W.2d 52, 53 (Mo.App. E.D.1989).

J.H. argues that it is not necessary to memorialize a settlement agreement in writing in order for it to be enforceable. Although J.H. is correct, this unopposed legal principle is of no assistance to J.H. The trial court did not conclude that the parties failed to reach an enforceable settlement agreement because they could not agree to terms in writing. The trial court simply concluded that the parties never reached an agreement about all essential terms of settlement, including, specifically, the confidentiality provision. This determination would have been applicable whether the parties had been negotiating orally or in writing. Here, Brown expressly reserved an essential term of the contract—the confidentiality provision—for future determination, a determination the parties undertook to accomplish but were unable to do so. *Gateway Exteriors, Inc. v. Suntide Homes, Inc.*, 882 S.W.2d 275, 279 (Mo.App. E.D.1994) ("If the parties have reserved the essential terms of the contract for future determination, there can be no valid agreement."). It is superfluous to the outcome of this case that the efforts to reach an agreement about the precise language of the confidentiality provision had been attempted via the exchange of written drafts.

J.H. did not establish by clear and convincing evidence that the parties had come to an agreement as to all of the essential terms of the settlement agreement as of April 2, 2007, or as of any date, for that matter. *Arrowhead Contracting, Inc. v. M.H. Washington, L.L.C.*, 243 S.W.3d 532, 535 (Mo.App. W.D.2008) (stating that an enforceable contract requires that the parties mutually agree to all essential terms). "Negotiations or preliminary steps towards a contract do not constitute a contract. The existence of a contract necessitates a 'meeting of the minds' which the

court determines by looking to the intention of the parties as expressed or manifested in their words or acts." *Gateway Exteriors,* 882 S.W.2d at 279 (citation omitted). The trial court's judgment, therefore, finding that an enforceable settlement agreement had not been reached, is not against the weight of the evidence and does not erroneously declare or apply the law.

## Conclusion

The judgment of the trial court is affirmed.

All concur.