**AROUND THE WORLD IMPORTING, INC., James Gerhardt, Bonnie Gerhardt, Marvin Westhoelter and Betty Westhoelter, Plaintiffs–Appellants,**

v.

**MERCANTILE TRUST COMPANY, N.A. and Susan T. McSwain, Defendants–Respondents.**

No. 57135.

Missouri Court of Appeals, Eastern District, Division Four.

Aug. 14, 1990.

Arthur G. Muegler Jr., St. Louis, for plaintiffs-appellants.

David Wells, Michael Joseph Morris, John J. Carey, St. Louis, for defendants-respondents.

STEPHAN, Judge.

Appellants, Around the World Importing, Inc. ("ATW"), James Gerhardt, Bonnie Gerhardt, Marvin Westhoelter and Betty Westhoelter, brought an action in six counts against respondents, Mercantile Trust Company, N.A. ("Mercantile") and Susan T. McSwain. Count I was ATW's claim for negligence, Count II was ATW's claim for fraudulent misrepresentation, Count III was the Westhoelters' individual claim for negligence, Count IV was the Westhoelters' individual claim for fraudulent misrepresentation, Count V was the Gerhardts' individual claim for negligence and Count VI was the Gerhardts' individual claim for fraudulent misrepresentation. Appellants alleged that respondents had defrauded them and negligently performed an oral contract by recommending a Small Business Administration ("SBA") guaranteed loan, rather than some other form of financing.

The trial court submitted only Count II to the jury which returned a verdict in favor of respondents. The trial court then entered a clarifying order dismissing Counts III through VI. That judgment

was appealed to this Court on July 8, 1988. The appeal was dismissed because the Circuit Court's order did not reflect a final judgment. *Around The World Importing, Inc. v. Mercantile Trust Company*, 771 S.W.2d 919, 922 (Mo.App.1989). On remand, and after a hearing, the circuit court entered an order, nunc pro tunc, sustaining respondents' motion for directed verdict at the close of all the evidence as to Counts I, III, IV, V and VI. This appeal followed.

ATW was formed in March 1980. Its purpose was to engage in the wholesale and retail sale of antique reproductions. The principals, Marvin Westhoelter and James Gerhardt, decided to form the business because of their combined experience. Westhoelter owned a retail antiques and used furniture store called Second Hand Rose. Gerhardt had previously formed a "successful" safety supplies company. They along with another associate, Ed Griesedieck, spent nearly two years investigating the proposed business. They also retained an attorney and an accountant to assist them.

Their investigation resulted in a written business proposal which included detailed financial and operating projections plus a narrative description of the proposed business. The business proposal specifically identified ten assumptions on which it was based, but it did not mention letters of credit or the importance of purchasing overseas.

In the fall of 1980, ATW decided to seek a start-up loan. Griesedieck telephoned Mercantile's chairman of the board and chief executive officer, Donald Lasater, an acquaintance of his, and requested an appointment to talk about a loan for ATW. Lasater met with Westhoelter, Gerhardt and Griesedieck on October 7, 1980. According to Griesedieck, the purpose of the meeting was "to introduce ourselves to [Lasater] and to obtain from him an introduction to some officer of the company that I thought would be handling the loan if in fact we were going to obtain a loan." The meeting lasted approximately fifteen minutes. Lasater then turned the ATW representatives over to John Vallina, a senior loan officer. Vallina eventually assigned the loan to Susan McSwain.

McSwain and Vallina agreed that ATW's loan request was "marginal," because ATW was a new company with no history, was thinly capitalized and highly leveraged, and had no hard collateral. Mercantile was only willing to offer the company a ninety percent SBA guaranteed loan. McSwain advised ATW's principals of this decision in November 1980.

There was an SBA restriction which prohibited borrowers from investing SBA guaranteed loan proceeds or depositing them into bank savings or checking accounts for extended periods of time. This meant that ATW could not use the SBA funds to collateralize international letters of credit because there is generally a four to eight week delay between the issuance of international letters of credit and ultimate payment thereon. ATW's principals, and its attorney, were aware of this prohibition against collateralizing letters of credit at least six weeks before the loan closed on February 26, 1981. As a further condition, Westhoelter, Gerhardt and their wives, who were also officers of the corporation, were required to sign personal guarantees.

ATW opened for business in April 1981, approximately one month after the loan closing. As a consequence of low sales and managerial problems, ATW lost substantial sums of money each month. On August 14, 1981, after several meetings and discussions with ATW's principals, McSwain concluded that it was necessary to stop funding the loan and assigned the unpaid balance to the SBA for collection. ATW ultimately closed its doors in April 1984.

ATW, Westhoelter and Gerhardt argue that they were misled by the bank. They state that it was made perfectly clear that it was necessary to purchase their goods from overseas in order to make the profit forecast in their business plan. International letters of credit were vital to the plan. They claim that McSwain told them she would arrange for letters of credit, but never did. They further argue that Mercantile orally contracted to provide them

with financial planning services and that Mercantile negligently performed that contract by recommending the SBA loan.

When we review a directed verdict entered in a defendant's favor, we view the evidence and inferences in the light favorable to plaintiffs and disregard all contrary evidence and inferences. *Sisters of St. Mary v. Blair,* 766 S.W.2d 773, 774 (Mo. App.1989). If, however, reasonable grounds support the directed verdict, we will affirm the trial court's order. *Id.* Although the defendant's evidence is rejected unless it aids plaintiffs' case, plaintiffs still bear the burden of removing the case "from mere conjecture and to establish their case by substantial evidence having probative value or by reasonable inferences which can be drawn from [their] evidence." *State ex rel. Missouri Highway and Transportation Commission v. Keeley,* 780 S.W.2d 84, 87 (Mo.App.1989), quoting from *Gordon v. Oidtman,* 692 S.W.2d 349, 352 (Mo.App.1985).

In their first point, appellants assert that the trial court erred in issuing its nunc pro tunc order, after remand, sustaining respondents' motion for directed verdict at the close of all the evidence as to counts I, III, IV, V and VI. They argue that the order was an improper use of the nunc pro tunc procedure, because: 1) the trial court actually overruled respondents' May 26, 1988 motion for directed verdict at the close of all the evidence, so there was no clerical error to correct; 2) there is nothing in the record to support the nunc pro tunc order; 3) the nunc pro tunc order improperly attempts to change the trial court's action and exercise of judicial discretion on May 26, 1988; and 4) the nunc pro tunc order relates to the exercise of judicial discretion affecting the substantial rights of the parties instead of the ministerial correction of the trial court's records to reflect the judicial determination actually made.

■■■ The purpose of a nunc pro tunc amendment is to make the record conform to what was actually done where there is a basis in the record for the amendment. *Brunton v. Floyd Withers, Inc.,* 716 S.W.2d 823, 826 (Mo.App.1986). The function of such an amendment is to correct clerical omissions, mistakes or misprisions to make the record speak the truth by evidencing an act done or a judgment actually rendered at a prior time but not carried into or properly recorded in the record. *State ex rel. Missouri Highway and Transportation Commission v. Roth,* 735 S.W.2d 19, 21 (Mo.App.1987). They do not lie to correct judicial errors, mistakes or oversights, or to create a new record or to enter a judgment never made or one different from that actually rendered, albeit the judgment rendered was not the judgment the judge intended to make. *Id.*

■■■ As stated previously, the July 1, 1988 order dismissing Counts I, III, IV, V and VI, was not final. *Around the World Importing,* 771 S.W.2d at 922. At any time before final judgment a court may open, amend, reverse or vacate an interlocutory order. *Woods v. Juvenile Shoe Corporation,* 361 S.W.2d 694, 695 (Mo.1962). In *State ex rel. Schweitzer v. Greene,* 438 S.W.2d 229, 232 (Mo. banc 1969), the rule was stated as follows:

Logic and justice would seem to indicate that a trial court should be permitted to retain control of every phase of a case so that it may correct errors, or, in its discretion, modify or set aside orders or judgments until its jurisdiction is extinguished by the judgment becoming final and appealable.

Missouri does not follow the doctrine that a motion once ruled on cannot be reconsidered. *Richey v. Meter Investments, Inc.,* 680 S.W.2d 381, 384 (Mo.App.1984). To do so would mean that a trial court could never correct what it ultimately concludes to have been a mistaken judgment even when its jurisdiction over the case remains intact. *Id.*

■■■ The trial court still had jurisdiction over this case. The trial court held a hearing and determined that the motion for directed verdict at the close of all the evidence should be sustained. If it was erroneous to designate the order nunc pro tunc, the error was harmless because the trial court followed proper procedure. We are

not required to reverse a judgment unless the error thus committed materially affected the merits of the action under review. *Roque v. Kaw Transport Company,* 697 S.W.2d 254, 256 (Mo.App.1985). Point I is denied.

Appellants' second point on appeal is that the trial court erred in refusing to allow them to read portions of depositions of two Mercantile employees, Sharon Cummins and Donnell Reid, into evidence. Cummins and Reid were deposed on April 15, 1988, as Mercantile's designated representatives pursuant to Rule 57.03(b)(4). The trial court ruled that both Cummins and Reid were available to testify in person.

Rule 57.07(a)(2) provides:

(a) At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had proper notice thereof, in accordance with any of the following provisions:

(2) The deposition of a party, or of anyone who at the time of taking the deposition was an officer, director, or managing agent, or a person designated under Rule 57.03(b)(4) or 57.04(a) to testify on behalf of a public or private corporation, partnership or association or governmental agency which is a party, may be used by an adverse party for any purpose.

The language of subparagraph (a)(2) authorizing the admissibility of the deposition testimony of an adverse party for "any purpose" has been interpreted to mean so long as it is an admission against interest. *See, Teachenor v. DePriest,* 600 S.W.2d 122, 125 (Mo.App.1980). In order for a statement of a party to be competent as an admission against interest, it is not necessary that it be a direct admission of the ultimate facts in issue, but it may be competent if it bears on the issue incidentally or circumstantially. *Coulter v.*

*Michelin Tire Corporation,* 622 S.W.2d 421, 433 (Mo.App.1981).

There are three requirements necessary to admit an admission by a party-opponent: 1) a conscious or voluntary acknowledgment by a party-opponent of the existence of certain facts; 2) the matter acknowledged must be relevant to the cause of the party offering the admission; and, 3) the matter acknowledged must be unfavorable to, or inconsistent with, the position now taken by the party-opponent. *United Services of America, Inc. v. Empire Bank of Springfield,* 726 S.W.2d 439, 444 (Mo.App.1987). Any error in the exclusion of any evidence is, however, harmless if the same facts are shown by other evidence and exhibits. *Tennis v. General Motors Corporation,* 625 S.W.2d 218, 233 (Mo.App.1981); *Spivack v. Spivack,* 283 S.W.2d 137, 142 (Mo.App.1955).

The testimony of Reid and Cummins was cumulative of other testimony introduced at trial. The purpose of Sharon Cummins' deposition was to explain the nature and purpose of letters of credit generally and Mercantile's involvement therewith, and to show Mercantile's internal procedures during the relevant period of time. Almost every witness who appeared at trial testified about the nature, purpose and mechanics of letters of credit, their use in certain international transactions and Mercantile's involvement in and ability to issue letters of credit. Appellants argue, however, that the exclusion of Cummins' testimony prejudiced them because they were unable to show that, pursuant to Mercantile's established procedure, only McSwain, and not appellants themselves, could initiate a letter of credit application with Mercantile's international department. McSwain, however, admitted this fact during cross-examination:

Q: ... Is it correct that the international department of Mercantile will not issue a letter of credit unless requested by the customer's loan officer? Is that correct?

A: Yes.

Q: And the loan officer for Around the World was you, right?

A: That's correct.

Q: And so that the international department, letter of credit department at Mercantile would not have issued this letter of credit without your authorization under standard procedures; isn't that correct?

A: That's correct.

Cummins' deposition testimony was, therefore, duplicative and cumulative of other testimony, and, was properly excluded.

Reid's deposition was offered to show that there was a "dramatic reorganization" of McSwain's department in the spring of 1981, and that McSwain was an inexperienced loan officer who was essentially unsupervised. The reorganization of McSwain's department was not in dispute and was irrelevant because it took place months after appellants' loan had closed. The reorganization could not have affected Mercantile's evaluation of ATW's loan request, and there was nothing in the offer of proof to indicate that it affected McSwain's decision to stop funding the loan.

 McSwain's experience and background was also established by McSwain's own testimony and that of Vallina. A trial court has considerable discretion in the exclusion of evidence; and, unless there was an abuse of that discretion, its action will not be grounds for reversal. *Karashin v. Haggard Hauling & Rigging, Inc.*, 653 S.W.2d 203, 205 (Mo. banc 1983). There was no abuse of discretion here. It is of no moment that the trial judge based his ruling on the availability of the witnesses. An appellate court will not reverse a correct result if granted for the wrong reason. *Roberts Fertilizer, Inc. v. Steinmeier*, 748 S.W.2d 883, 886 (Mo.App.1988). Point II is denied.

Appellants next argue that the trial court committed prejudicial error in directing a verdict for respondents, and against ATW, on Count I, and in refusing to give Instruction A. Appellants assert that a valid oral contract existed between Mercantile and ATW whereby Mercantile agreed to exercise due care in reviewing ATW's business plan and in recommending an appropriate loan. They claim that they asserted a cause of action under either breach of contract or negligent lending theories because respondents owed appellants a duty to exercise due care based on the oral contract. They further allege that each ultimate fact hypothesized in Instruction A was supported by substantial evidence.

Appellants claim that during ATW's initial meeting with Mercantile, Donald Lasater promised Mercantile would act as ATW's financial advisor and recommend the best form of financing for ATW. They argue that Mercantile negligently performed its obligations under the contract by recommending the $300,000 SBA guaranteed loan.

 The creation of a contract requires a definite offer and an unequivocal acceptance. *Hyken v. Travelers Insurance Company*, 678 S.W.2d 454, 458 (Mo. App.1984). For a contract to be valid and enforceable the nature and extent of its obligations must be certain. *Tessler v. Duzer*, 309 S.W.2d 1, 3 (Mo.App.1958). The offer must be sufficiently specific on the terms of the contract that, upon its acceptance, a court may enforce the contract so formed. *Hyken*, 678 S.W.2d at 458. If the essential terms of the contract are reserved for future determination by the parties there can be no valid agreement. *Tessler*, 309 S.W.2d at 3–4.

 Appellants' evidence was not sufficient to establish the existence of a valid and enforceable contract. In fact, Gerhardt admitted that an agreement was never actually reached. Westhoelter testified that, while a retainer fee was discussed, no agreement on the amount of such fee was ever reached. The terms of the alleged oral contract were also uncertain, vague and ambiguous. Appellants claim that ATW retained Mercantile to recommend appropriate financing and that, in return, ATW was willing to pay Mercantile an unspecified fee and/or would open unspecified accounts with Mercantile. If the content of an agreement is unduly uncertain and indefinite, no contract is formed. *Dennis Chapman Toyota, Inc. v.*

*Belle State Bank,* 759 S.W.2d 330, 334 (Mo.App.1988).

Respondents did not owe a duty to appellants because no contract was formed. Thus, there was no error in refusing Instruction A because there was no evidence to support the existence of a contract. Point III is denied.

Appellants' final two points assert that the trial court erred in directing a verdict on the Westhoelters' and the Gerhardts' individual claims, Counts III, IV, V and VI. We find no error because Westhoelter and Gerhardt had no standing to sue individually.

 A shareholder is without standing to sue in his individual capacity for damages to the corporation. *Jones v. Rennie,* 690 S.W.2d 164, 166 (Mo.App.1985). The loan here was made to the corporation. Westhoelter and Gerhardt were required to sign personal guarantees because of the then current financial condition of the company and because they were the only officers, directors and shareholders. Mercantile dealt with Westhoelter and Gerhardt as representatives of ATW and not as individuals. Any lost profits were sustained by ATW; any damage to credit was suffered by the corporation. *See, Sedalia Mercantile Bank and Trust Company v. Loges Farms, Inc.,* 740 S.W.2d 188, 197 (Mo.App. 1987). Points IV and V are, therefore, denied.

The judgment of the trial court is affirmed.

CARL R. GAERTNER, P.J., and SIMEONE, Senior Judge, concur.