Julie BLAKE and Thomas
Blake, Respondents,

v.

Douglas H. IRWIN, D.D.S., Appellant.

No. WD 50648.

Missouri Court of Appeals,
Western District.

Jan. 23, 1996.

Michael P. Oliver, Wallace, Saunders, Austin, Brown and Enochs, Kansas City, for appellant.

Walter R. Simpson, Sanders & Simpson, Kansas City, for respondents.

Before ELLIS, P.J., and HANNA and SPINDEN, JJ.

ELLIS, Presiding Judge.

Douglas H. Irwin, D.D.S., appeals the judgment of the Jackson County Circuit Court in favor of Julie Blake and Thomas Blake following a jury trial in an action for medical malpractice.

Toward the end of July, 1991, Julie Blake was referred by her dentist to Dr. Irwin after x-rays revealed she needed to have her third molars (wisdom teeth) extracted. Blake first saw Dr. Irwin on July 31, 1991, and on August 1, 1991, Dr. Irwin performed surgical extraction of Blake's four wisdom

teeth. Following the extraction, Blake began to experience jaw pain, facial pain, gritting and popping in both jaw joints, inability to open her mouth, numbness in her lower jaw, lip and gums, ringing in the ear, dizziness, headaches, earaches, and throat and neck pain. After eight or nine return visits to Dr. Irwin regarding these problems, she went to see Dr. Robert Arms, D.D.S., who suggested she try again to talk to Dr. Irwin about her condition. Still dissatisfied with Dr. Irwin's failure to alleviate her problems, Blake returned to Dr. Arms who attempted minor treatments to relieve Blake's symptoms. Dr. Arms' treatments proved unsuccessful in relieving Blake's problems so he eventually referred Blake to Dr. Edward Moseby, D.D.S., a temporomandibular specialist.

In an effort to correct Blake's post-extraction problems, Dr. Moseby performed multiple surgeries and medical treatments on Blake, including, among other things, several arthrocenteses (placing needles into the jaw's joint space and flushing debris out of the joint with fluid), arthroscopic surgery on both temporomandibular joints, steroid injections in both joints, and open surgery on the right temporomandibular joint, removing the disk and inserting temporary interpositional material in place of the disk. In addition to his own treatments, Dr. Moseby referred Blake to a periodontist because he believed she had an excessive amount of bone loss where the third molar tooth (wisdom tooth) had been removed. He also referred her to a pain clinic for pain management and to a physical therapy clinic in an attempt to increase the range of motion of her joint.

On July 8, 1992, Blake and her husband [1] filed a petition for damages against Dr. Irwin, alleging his treatment was negligent and below the standard of care in the following respects:

a) Using excessive force in manipulating Blake's mandible;

b) Causing dislocation or derangement of the temporomandibular joints bilaterally;

c) Removing or damaging excessive bone and the extraction sites of the lower third molars bilaterally;

d) Failing to control the dental handpiece and drilling into the mandibular canal;

e) Failing to use adequate irrigation of the operative site during bone removal;

f) Failing to properly control the dental handpiece, scalpel, forceps and/or hemostat so as to avoid damage to the lingual nerves bilaterally; and

g) Failing to properly section the lower third molars.

Blake claimed damage to her lingual nerves and mandibular nerves bilaterally (resulting in permanent alteration and/or loss of normal feeling, sensation and taste in her tongue, gums, lips and chin); damage to her temporomandibular joints bilaterally (requiring the surgical removal of her right TM disc and permanently impairing the normal function of her lower jaw for speech, eating, and other activities of every day life); and past and future medical and dental expenses, lost wages, disabilities, disfigurement, pain, suffering and mental anguish.

On June 6, 1994, the case was tried to a jury in Jackson County Circuit Court. At the close of plaintiffs' case, Dr. Irwin moved the court for a directed verdict on all issues and counts. The Honorable Scott Sifferman entered a directed verdict on all of Blake's claims for future medical expenses and for any damages or claims relating to lingual nerve injury, and submitted the remaining issues to the jury.[2] After approximately eleven hours of deliberation, the jury announced it had reached an impasse and the trial court declared a mistrial as to the issues that had been submitted to the jury. On June 10, 1994, the court entered an order declaring a mistrial and reinstating the case on the active docket. It then entered an order nunc pro tunc modifying the June 10 order to enter the directed verdict regarding the issues relating to the lingual nerve injury and future medical damages.

1. Thomas M. Blake's claim was for loss of spousal services, consortium and companionship. Hereafter, all references to Blake are to either or both Julie and Thomas Blake.

2. The record before us does not contain a complete transcript of the June 6, 1994 trial.

On November 2, 1994, the Honorable David W. Shinn entered an order setting the case for trial on November 7, 1994, to be heard by a visiting judge. Immediately after receiving notice of the trial date, Dr. Irwin filed an application for continuance, citing discovery issues and scheduling difficulties with Dr. Irwin, Irwin's counsel, and Dr. Irwin's expert witness. The trial court denied the motion for continuance and the matter proceeded to trial with The Honorable Daniel Chadwick, Visiting Judge, presiding. In the pre-trial conference prior to the second trial, Judge Chadwick overruled Judge Sifferman's directed verdict regarding the lingual nerve injury and future medical damages issues, and stated that those issues would remain in the case to be tried as issues in the second trial.

Following the retrial, the jury returned a verdict in the amounts of $680,000 for Julie Blake and $35,000 for Thomas Blake. The trial court entered judgment on the jury's verdict on November 10, 1994. After the trial court denied Dr. Irwin's motion for judgment notwithstanding the verdict or motion for new trial, Dr. Irwin filed his notice of appeal with this court.

■ Dr. Irwin raises six points on appeal. In his first point, he alleges the trial court erred in denying his motions for directed verdict and judgment notwithstanding the verdict because Blake failed to present sufficient evidence to make a submissible case in that she offered no testimony or other evidence that Dr. Irwin used excessive force or failed to sufficiently irrigate during the extraction of Blake's lower third molars.

In deciding whether the plaintiff made a submissible case against the defendant and whether a motion for directed verdict or for judgment notwithstanding the verdict should have been granted, the appellate court reviews the evidence from a viewpoint most favorable to the plaintiff and gives the plaintiff the benefit of every reasonable inference which the evidence tends to support, disregarding all contrary evidence. Under this standard, a jury verdict will not be overturned unless there is a complete absence of probative facts to support the verdict.

*Howard Constr. Co. v. Teddy Woods Constr. Co.*, 817 S.W.2d 556, 560 (Mo.App.1991) (citations omitted). "A case should not be withdrawn from the jury unless the facts in evidence and the inferences fairly deducible therefrom are so strongly against plaintiffs as to leave no room for reasonable minds to differ." *Bridgeforth v. Proffitt*, 490 S.W.2d 416, 423 (Mo.App.1973).

■ In order to make a prima facie case of medical malpractice, the plaintiff must prove (1) that an act or omission of the defendant fell below the requisite medical standard of care; (2) that the act or omission was performed negligently; and (3) that there is a causal connection between the act or omission and the plaintiff's injury. *Wilson v. Lockwood*, 711 S.W.2d 545, 550 (Mo.App. 1986). Dr. Irwin contends Blake did not offer evidence that he used excessive force or failed to sufficiently irrigate during the extraction of Blake's lower third molars, and therefore, Blake did not establish a submissible case. Dr. Irwin's argument fails.

■ Blake did offer substantial evidence regarding Dr. Irwin's negligence, including the use of excessive force in extracting Blake's lower third molars, drilling without sufficient irrigation, and removal of Blake's lower third molars without sectioning. Dr. Moseby, who performed the multiple surgeries and treatments following the extraction, testified on Blake's behalf. He testified that based on the post-extraction results he has observed in Blake, he believes Dr. Irwin's care fell below an acceptable standard. Regarding the damage to Blake's nerves, he testified:

Q. Based on what you observed about the total picture of Julie's condition, do you believe that her injuries to the alveolar nerve and the lingual nerve fall just within that statistical probability, or do you believe there's another explanation for it?

A. I believe that there was excessive bone removal and excess force used in removing those teeth that caused her problem.

He specifically testified that in his opinion, it was below the standard of care for a surgeon

to remove Blake's wisdom teeth without sectioning them. He further testified:

> Q. All right. With respect to the damage to the TMJ [temporomandibular joint] that you have told us about, do you have an opinion as to whether it would be below the standard of care for Dr. Irwin in the extraction of third molars to use the amount of force that it would have taken to cause the damage that you've observed?
>
> A. In the overall picture, my answer is the same. Yes.

He then stated:

> If the surgical procedure that was accomplished that ended up with the post-surgical results that we see is not below the level of standard of care—and that's within the norm—if it's within the norm to produce this kind of post-surgical result, then we would see hundreds of thousands if not millions of them a year. This is the first one I have ever seen in my entire life.

Furthermore, Dr. Arms, who was the first physician who saw Blake after she realized Dr. Irwin was unable to remedy her post-extraction problems, testified that in his opinion, Blake's wisdom teeth should have been sectioned and that Dr. Irwin's failure to do so caused damage to Blake's temporomandibular joints and caused many of her problems. He was specifically questioned about Dr. Irwin's negligence:

> Q. And give us some idea about surgeon negligence. What percentage of patients having extractions could expect to have [damage to the alveolar nerve] as a complication?
>
> A. Literature states that approximately two percent will end up with a type of a paraesthesia.
>
> Q. In this case, do you believe her numbness is just part of the statistical two percent, or do you believe there's another explanation for it?
>
> A. I feel like it's probably from not sectioning the teeth and damaged [sic] the nerve during surgery.

\* \* \*

> Q .... do you have an opinion as to whether or not she sustained lingual nerve damage during the extraction process?
>
> A. I feel that she did.
>
> Q. Now is that a type of an injury that statistically you could have that complication without negligence of a surgeon?
>
> A. Statistically, they say anywhere from one half to one percent could sustain lingual nerve damage taking out impacted teeth.
>
> Q. In your opinion with respect to Ms. Blake's lingual nerve damage, is she just a part of the statistic, or do you believe there's another explanation?
>
> A. I don't feel like she's part of the statistics.

When he was asked whether Blake's joints were damaged as a result of the extraction of the third molars by Dr. Irwin, Dr. Arms replied:

> A. Considering how she was when she came into my office, I feel like they were probably damaged at the time of surgery.
>
> Q. And is that opinion based upon a reasonable degree of certainty in your field?
>
> A. Yes.
>
> Q. Doctor, in your opinion, did Dr. Irwin fall below the acceptable standard of care as I've defined it to you in removing these lower third molars without sectioning?
>
> A. I feel given the complications that resulted in the overall picture that the answer would be yes.

\* \* \*

> Q. Do you believe it was below the standard of care for Dr. Irwin in his extraction procedure to have damaged the alveolar nerve?
>
> A. It is not below the standard of care to damage the nerve. However, here again if you take the cumulative damage that was done, it is below the standard of care.
>
> Q. Let me ask you the same with respect to the lingual nerve damage.
>
> A. Yes.

Consequently, Dr. Moseby and Dr. Arms provided substantial testimony regarding Dr. Irwin's negligence in removing Blake's teeth. Both doctors testified they believed Dr. Irwin used excessive force to remove Blake's teeth and was negligent in doing so.

Dr. Irwin next contends that because Dr. Moseby and Dr. Arms based their opinions regarding Dr. Irwin's negligence on the adverse results, they did not meet Blake's burden of making a submissible case. He cites *Barr v. Plastic Surgery Consultants, Ltd.*, 760 S.W.2d 585 (Mo.App.1988), which states:

While an adverse result does not create a presumption of medical malpractice, the adverse result is a fact which may be considered so long as it does not constitute the complete basis for the expert opinion.

*Id.* at 590. *Barr* is distinguishable from the case *sub judice*. In *Barr*, the defendant was accused of medical malpractice because he had removed too much breast tissue in a breast reduction, causing the plaintiff to be extremely "flat chested." The expert in that case testified that in his opinion, the defendant had removed too much breast tissue. On cross examination, the expert was asked whether his opinion would be the same had the plaintiff been satisfied with the results. The expert replied that even if the plaintiff had been satisfied with the results, he, as a professional, did not find the results acceptable. The appellant complained that because the claim of negligence was based solely on the results, i.e., that the plaintiff was too "flat chested," there was no basis for negligence. The court said:

Considering Dr. Gutek's [the expert] testimony as a whole we find Dr. Gutek's reliance on plaintiff's dissatisfaction with the results of the breast reduction surgery as an element of consideration in coming to his conclusion. This being because if plaintiff had desired a flat chest, she then received her wishes and Dr. Lissner [the defendant] then had performed the surgery properly. But here a flat chest was not a desired result, thus the surgery that Dr. Lissner performed was deficient in that respect.

*Id.* The court found no error in allowing the case to go to the jury. Dr. Irwin relies on this case in support of his argument that expert testimony based solely on undesirable results is not proper.

Dr. Irwin's reliance is misplaced. Unlike *Barr*, where it is within the realm of possibility that a patient may desire the results Barr received from her surgical procedure, there can be no inference that any patient would desire the painful results Blake received from the extraction of her wisdom teeth in this case.

Dr. Irwin also cites *Heacox v. Robbins Educ. Tours, Inc.*, 829 S.W.2d 600, 603 (Mo. App.1992), which held that while we liberally view inferences in plaintiff's favor, we cannot take speculative free leaps to the desired inference. However, *Heacox* is also distinguishable. *Heacox* involved a case where the only testimony was the plaintiff's own testimony that the incline of a pathway on which she fell was "steep," and the testimony of a bus driver that "it wasn't really a steep slope, but it would be a steep slope for someone heavy or an elderly lady ...", thereby inferring the pathway was dangerous. There was no other evidence of the pathway's incline or the defendant's negligence. Thus, finding her statement to be, at best, a guess as to the cause of her fall, the court held the plaintiff had not made a prima facie showing of an unreasonable risk or cause. In contrast, in the case at bar, Dr. Moseby and Dr. Arms' testimony are the opinions of Blake's treating physicians as well as expert opinions as to the cause of Blake's post-extraction problems. Thus, *Heacox* is not analogous to the case at bar and is inapplicable.

Dr. Irwin's first point is denied.

In his second point, Dr. Irwin contends the trial court erred in denying his motions for directed verdict and JNOV because Blake did not present sufficient evidence to make a submissible case in that she failed to prove any negligent act of Dr. Irwin caused or contributed to cause her injuries, the third requirement in a malpractice action. *Wilson v. Lockwood*, 711 S.W.2d at 550. For the reasons discussed in detail in Point I, Dr. Irwin's point is without merit.

In his third point, Dr. Irwin contends the trial court committed reversible error in allowing Dr. Moseby to give opinions regarding Dr. Irwin's failure to section the teeth before removal because that subject was not offered in his deposition or in the prior trial

nor was it disclosed in interrogatory answers.[3]

 "The admissibility of evidence, including the testimony of an expert, is a matter within the discretion of the trial court." *Cooper v. Ketcherside*, 907 S.W.2d 259, 260 (Mo.App.1995).

> Judicial discretion is abused when the trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration; if reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion.

*Green v. Fleishman*, 882 S.W.2d 219, 223 (Mo.App.1994).

> [W]hen an expert witness has been deposed and he later changes his opinion before trial or bases that opinion on new or different facts from those disclosed in the deposition, it is the duty of the party intending to use the expert witness to disclose that new information to his adversary, thereby updating the responses made in the deposition.

*Gassen v. Woy*, 785 S.W.2d 601, 604 (Mo. App.1990). When such evidence is introduced and is challenged on the ground that it had not been disclosed in response to appropriate discovery, the trial court has broad discretion and may admit or reject the evidence or determine and impose other appropriate sanctions. *Id.*

 According to Dr. Irwin, Dr. Moseby never indicated he would testify regarding his opinion that Dr. Irwin should have sectioned Blake's teeth before removing them. At his deposition, Dr. Moseby offered his opinion regarding deviation from the standard of care as to the alveolar nerve damage, the lingual nerve damage, and the injury to the temporomandibular joint. He was then asked whether he wanted or intended to express any other opinions concerning Dr. Irwin's care and treatment and he replied he

did not. Dr. Irwin contends he was unfairly surprised by Dr. Moseby's testimony regarding the need to section Blake's teeth prior to removal.

In *Green, supra,* the expert had specifically declared at his deposition that *there was no data* and no objective evidence of toxic levels of a certain medication in the plaintiff's system and that *he specifically had no opinion on that subject.* Then at trial, he declared that *based on the data, he believed it was likely the levels had increased to a toxic range.* The trial court struck the testimony and directed a verdict in favor of the defendants. We affirmed, stating:

> In this case, there was no new fact introduced which would have altered the deposition opinion—there was simply a 180 degree change from no opinion to one of negligence.

*Green,* 882 S.W.2d at 223. Dr. Irwin likens *Green* to the case at bar and alleges Dr. Moseby made a 180 degree change from his deposition testimony to his trial testimony regarding the need to section.

 *Gassen* and *Green* both stand for the proposition that the trial court has broad discretion to determine and impose appropriate sanctions for failure to disclose expert evidence upon which a party intends to rely. Appellate courts will only convict the trial court of abuse of that broad discretion when the record is clear that the trial court's action was arbitrary and so unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Green,* 882 S.W.2d at 223. In the case at bar, unlike the expert in *Green,* Dr. Moseby was not specifically asked at the deposition whether he had an opinion regarding sectioning of teeth. He testified regarding his opinion as to several aspects of Dr. Irwin's negligence (damaging Blake's nerves and joints) and then was asked generally whether he intended to offer any other opinions. Dr. Moseby was clear on his opinion that excessive force, an issue related to sectioning, was a cause of the damage. Testimony, even when phrased in the form of an opinion, that interprets or

---

**3.** Sectioning of teeth prior to removal is done to prevent the use of excessive force (causing damage) in removing the teeth.

supports opinions contained in depositions is not improper. *See King v. Copp Trucking*, 853 S.W.2d 304, 308 (Mo.App.1993). Dr. Moseby's opinion regarding sectioning supported his theory that excessive force had been used to remove the teeth. Also, Dr. Irwin knew his failure to section was an issue in the case and that Blake's other expert, Dr. Arms, was expected to testify regarding negligence in failing to section the teeth.

In the context of the entire case and the rest of Dr. Moseby's testimony, we find that allowing Dr. Moseby to testify on that issue certainly was not so arbitrary and unreasonable as to shock the sense of justice or indicate a lack of careful consideration by the trial court. It was, therefore, not an abuse of the trial court's discretion to allow the testimony. Point III is denied.

In his fourth point, Dr. Irwin contends the trial court committed reversible error in allowing Blake to introduce evidence that Dr. Irwin had been sued before. This occurred when Dr. Irwin's expert witness, Dr. Thomas, was cross-examined by the plaintiffs' attorney. He alleges the introduction of such evidence was inadmissible, was not proper impeachment of Dr. Irwin's expert witness, and unfairly prejudiced Dr. Irwin in that it suggested he was negligent in this case.

The relevant portion of the trial testimony went as follows:

Q. Now, you were asked to review the records and testify in this case by Mr. Oliver of Wallace, Saunders Law Firm, is that correct?

A. Yes.

Q. And this isn't the only time that you've been called upon by that law firm to testify on behalf of dentists that they represent, correct?

A. Yes. That's correct.

Q. You've done that at least three or four times?

A. Three, I believe, counting this.

Q. And is it true that you have never agreed to serve as an expert as you are here today for a patient against a dentist?

A. No. I don't believe that's true. I've been asked and agreed to in one situation, however it never went to court.

Q. Well, would you agree that you've never been an expert on behalf of a patient against a dentist?

A. I've never given a deposition or testified. That's correct.

Q. Let me go back and ask you, as a matter of fact, isn't it true that you haven't agreed serve [sic] as an expert on behalf of the plaintiff? Isn't that true.

A. I only remember one situation where I was asked to.

Q. Let me ask you at the time of deposition just a couple of months ago, you were asked, "Isn't it true that you have never agreed to serve as an expert witness on behalf of the plaintiff and issue or state opinions on standard of care issues favorable to the plaintiff, is that correct"

Your answer, "That's correct."

Is that the answer you gave?

A. That's the answer I gave. There was some explanation to that though.

Q. Well, the next question is, "Do you know how many separate cases you've been asked to review which involve Dr. Irwin?"

Is that explanation of that?

A. Yes.

Q. It is?

A. I'm sorry. I'm not—

[By Dr. Irwin's attorney]: Your Honor, may we—

A. —sure I understand your question.

[By Dr. Irwin's attorney]—approach?

Dr. Irwin's attorney then objected to the question and requested a mistrial. Blake's attorney responded that Dr. Thomas had raised the issue by stating he had an explanation to the previous question and that the allegedly improper question was merely the next question asked at the deposition. The trial court sustained the objection but did not grant a mistrial. Blake's attorney then continued questioning Dr. Thomas and asked him, "Where on that page [of the deposition transcript] is there any explanation of that?" This was the only reference to other lawsuits against Dr. Irwin.

 Dr. Irwin complains because the use of the question, "Do you know how many separate cases you've been asked to review which involve Dr. Irwin?" prejudiced him to an extent justifying a mistrial.

A mistrial is a drastic remedy, and the decision to grant one is largely within the discretion of the trial court. We will reverse only where there has been a manifest abuse of discretion. But to establish a manifest abuse, there must be a grievous error where prejudice cannot otherwise be removed.

*Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 867 (Mo. banc 1993) (citations omitted). We do not believe, in the context of Dr. Thomas' testimony, that the question about which Dr. Irwin complains prejudiced him to such an extent as to justify the drastic remedy of a mistrial. The trial court's decision does not constitute a manifest abuse of its discretion. Point IV is denied.

In his fifth point, Dr. Irwin contends the trial court erred in submitting the issues of tongue numbness (lingual nerve injury) and future medical damages to the jury because those claims were dismissed by order of the trial court following the presentment of evidence in the first trial. He contends the trial court's *sua sponte* ruling that those issues would go to the jury was beyond the court's authority and unfairly surprised and prejudiced him.

Following the first trial, on June 10, 1994, Judge Sifferman entered the court's order declaring a mistrial and reinstating the case on the active docket. On June 22, 1994, Dr. Irwin filed a motion for order *nunc pro tunc* and on July 5, 1994, Judge Sifferman entered an "Order Nunc Pro Tunc," in which he modified the June 10 order.[4] The order *nunc pro tunc* stated:

At the close of plaintiff's evidence, but prior to the submission of the case to the jury, the defendant moves for a directed verdict on all issues and all counts in the case. The Court denies the motion with the following exceptions:

The Court finds that a directed verdict should be in the same [sic] as hereby entered on all claims for future medical expenses, and for any damages or claims relating to lingual nerve injury.

After submission of the case to the jury for deliberations, the jury announces after approximately eleven hours of deliberation, that they have reached an impasse. Upon inquiry of the jury on the record and in open Court, the Court is satisfied that the jury is unable to reach a verdict in the matter, and the Court therefore declares a mistrial as to those issues submitted to the jury.

This case is therefore to be placed back upon the active docket of the Court, with this Order so noted.

 Initially we note that, as Blake suggests, the use of an order *nunc pro tunc* is quite limited. *Warren v. Drake*, 570 S.W.2d 803 (Mo.App.1978). Orders *nunc pro tunc* are appropriate only to correct clerical omissions, mistakes or misprisions so as to make the record accurately reflect a judgment actually rendered but not faithfully recorded in the record. *Around the World Importing, Inc. v. Mercantile Trust Co.*, 795 S.W.2d 85, 88 (Mo.App.1990). They do not lie to correct judicial errors, mistakes or oversights, or to create a new record. *Id.*

Arguably, the court's July 5, 1994 order does more than correct a clerical error; it changes the earlier order substantially by removing two issues from consideration at the retrial. Thus, as Blake points out, it is probably at least mislabeled. In any event, because we can decide the issue on other grounds, we will consider any error in designating the order *nunc pro tunc* harmless and will address Dr. Irwin's contention that pursuant to the order *nunc pro tunc*, Blake should not have been allowed to present evidence of tongue numbness and future medical damages.[5]

---

4. According to the court's docket entries, Dr. Irwin had filed a motion for the order *nunc pro tunc* on June 22, 1994. Apparently, Blake filed no response to the motion and did not oppose its entry. Dr. Irwin's motion is not contained in the record before us.

5. *See Around the World Importing*, 795 S.W.2d at 88, in which, addressing a similar issue, the

First, regarding Dr. Irwin's allegation that it was beyond the court's authority to overrule the earlier order directing a verdict, Dr. Irwin only makes general statements on that issue and cites no authority for it. "Ordinarily, a point of error unsupported by citation of relevant authority is deemed abandoned." *Johnson v. St. John's Mercy Medical Ctr.*, 812 S.W.2d 845, 849 (Mo.App. 1991) (*quoting Bishop v. Bishop*, 618 S.W.2d 261, 263 (Mo.App.1981)). However, we choose to address the argument even though Dr. Irwin does not urge this is a matter of first impression as justification for lack of cited authority. *Id.* Thus, the question is whether Judge Chadwick had the authority in the second trial to overrule the directed verdict entered in the first trial.

The answer is quite clear that Judge Chadwick did have the authority.

> Just as there is no final judgment when the jury cannot reach a verdict or when a new trial is granted, there is no final judgment as to those claims for which the court directed verdicts or those which the court has ordered held in abeyance.

*Robinson v. May Dep't Stores Co.*, 723 S.W.2d 603, 605 (Mo.App.1987). After the first trial, none of the issues of the case, including those disposed by the directed verdict, were final judgments. "At any time before final judgment a court may open, amend, reverse or vacate an interlocutory order." *Around the World Importing*, 795 S.W.2d at 88.

> Logic and justice would seem to indicate that a trial court should be permitted to retain control of every phase of a case so that it may correct errors, or, in its discretion, modify or set aside orders or judgments until its jurisdiction is extinguished by the judgment becoming final and appealable.

*Id.* (*quoting State ex rel. Schweitzer v. Greene*, 438 S.W.2d 229, 232 (Mo. banc

1969)); Rule 74.01(b).[6] Thus, the trial court had the authority, in its discretion, to modify or set aside its earlier orders until the judgment became final and appealable. Consequently, because the directed verdicts were not final judgments, the trial court had the authority to modify or overrule the order directing them.

Anticipating this conclusion, Dr. Irwin argues that because Blake never challenged the entry of the order *nunc pro tunc* either before or after it was entered, she acquiesced in its entry and was therefore estopped from presenting evidence on those issues at the second trial. "The doctrine of equitable estoppel seeks to foreclose one from denying his own expressed or implied admissions which have in good faith and in pursuance of its purpose been accepted and relied upon by another." *Pinnell v. Jacobs*, 873 S.W.2d 925, 927 (Mo.App.1994). The elements of equitable estoppel are (1) an admission, statement, or act (including silence or inaction) that is inconsistent with the claim that is later asserted and sued upon; (2) an action taken by a second party on the faith of the admission, statement or act; and (3) an injury to the second party if the first party is permitted to contradict or repudiate his admission, statement, or act. *Id.*; *UAW–CIO Local # 31 Credit Union v. Royal Ins. Co.*, 594 S.W.2d 276, 283 (Mo. banc 1980). We restrict the application of the doctrine of equitable estoppel to those cases in which each element clearly appears, and the party asserting estoppel must establish each essential element by clear and satisfactory evidence. *Pinnell*, 873 S.W.2d at 927.

Dr. Irwin contends Blake's inaction after the entry of the order *nunc pro tunc* constitutes an inconsistent action, presumably inconsistent with her presentation of evidence on that issue at the second trial. He declares that because of Blake's inaction, he assumed those issues would not be part of

---

court found that, "If it was erroneous to designate the order nunc pro tunc, the error was harmless because the trial court followed proper procedure."

**6.** Rule 74.01(b) provides "any order or other form of decision, however designated, that adjudicates fewer than all the claims or the rights

and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and rights and liabilities of all the parties."

the second trial and therefore was unprepared to cross-examine Blake's witnesses concerning those claims, and that as a result of his reliance on Blake's inaction, he suffered injury, specifically, the jury's award of $125,000 for future medical damages.

■ We question whether Dr. Irwin has clearly established each of the three elements of estoppel.[7] In any event, assuming, *arguendo*, that he did, we do not believe it should apply in this case. "Estoppel is not a favorite of the law and will not be lightly invoked; it should be applied with care and caution and only when all elements constituting estoppel clearly appear." *State ex rel. Sprouse v. Carroll County Comm'n*, 889 S.W.2d 907, 911 (Mo.App.1994). Estoppel arises from the unfairness of permitting a party to belatedly assert rights if he knew of those rights but took no steps to enforce them until the other party had in good faith become disadvantaged by changed conditions. *Stenger v. Great Southern Sav. & Loan Ass'n*, 677 S.W.2d 376, 383 (Mo.App. 1984).

Dr. Irwin has not shown this court how he was unfairly disadvantaged by allowing Blake to present evidence of lingual nerve damage and future medical damages. Those issues were alleged in the original petition and were the subject of discovery throughout the process, both before and after the first trial.[8] The witnesses at the second trial were the same as the witnesses in the first trial. Dr. Irwin was prepared to, and did, address those issues in the first trial only a few months earlier. He clearly could not have been unfairly surprised and prejudiced by allowing those issues to remain in the case.

Dr. Irwin cites *Steen v. Colombo*, 799 S.W.2d 169 (Mo.App.1990), which states, "a party may estop himself from taking an appeal by performing acts after the rendition of the order or judgment which are clearly inconsistent with the right of appeal, and the estoppel may consist of any voluntary act which expressly or impliedly recognizes the validity of the judgment, order or decree." *Id.* at 174 (citations omitted). However, *Steen* and the sources cited therein deal with the satisfaction or other compliance with a civil judgment as barring the right to appeal. It is inapplicable to the case at bar.

■ In addition to estoppel, Dr. Irwin also contends that by her inaction regarding the entry of the order *nunc pro tunc*, Blake waived her right to raise the issues disposed by it. Waiver and estoppel are separate doctrines. *Midwest Petroleum Co. v. American Petrofina, Inc.*, 603 F.Supp. 1099, 1114 (E.D.Mo.1985). A waiver is the intentional relinquishment of a known right which may be implied from a party's conduct. *Id.*; *Howe v. Lever Bros. Co.*, 851 S.W.2d 769, 775 (Mo.App.1993). To be so implied, the conduct must clearly and unequivocally show a purpose to relinquish the right. *Brown v. State Farm Mut. Auto. Ins. Co.*, 776 S.W.2d 384, 387 (Mo. banc 1989). Blake's conduct in no way suggests an unequivocal purpose to relinquish the right to present evidence on those issues. Point denied.

In his final point, Dr. Irwin contends the trial court erred in denying his motion for a continuance of trial because notice of the trial was insufficient to allow Blake to seasonably supplement her answers to interrogatories or to allow him to complete additional discovery and trial preparation. He claims Blake's "unseasonable supplementation" unfairly prejudiced him.

In the August 9, 1994, Motion for Assignment to Special Judge for Trial, with the agreement of Dr. Irwin's counsel, Blake moved for a re-trial of the case "the week of October 24, 1994, November 7, 1994 or No-

---

7. It is questionable whether his assumption that the issues would not be allowed in the second one is reasonable. Additionally, the injury he claims (meeting the third requirement) is that the jury awarded $125,000 for future medical damages. However, it has been held that an adverse judgment (such as damages) does not satisfy the injury element of estoppel. *Pinnell v. Jacobs*, 873 S.W.2d at 928.

8. For instance, in his November 3, 1994 Application for Continuance, citing incomplete discovery regarding prescription medications and pain relievers following the first trial, Dr. Irwin stated, "Consistent with the last trial of this matter, it is expected plaintiff will claim as damages in this case, the cost of such prescriptions, both in the past and the future."

vember 14, 1994." In the suggestions supporting the motion, the parties again stated they were in agreement for trial to be set on one of those dates and cited a "desire to retry the case without waiting for Division 1 to return to civil assignment in March, 1995." On November 2, 1994, the trial court entered its order setting the case for trial on November 7, 1994. On November 3, 1994, Dr. Irwin filed a motion for continuance, citing incomplete discovery, scheduling conflicts and prejudice to his defense.

Blake responded by filing suggestions in opposition to Dr. Irwin's application for continuance, alleging Dr. Irwin had consented to this date, had been notified of the set trial date (orally) at least two weeks earlier, that Blake's ongoing treatment (the records about which Dr. Irwin complained of lack of discovery) was simply a continuation of the same type of treatment she had been receiving since the extraction, and that she did not intend to introduce into evidence anything that had not already been provided to Dr. Irwin's counsel. She also informed the court that she had appeared for deposition on November 3, 1994 at Dr. Irwin's attorney's office so he would have an opportunity to question her regarding her ongoing medical care. She also pointed out that her experts had planned to appear at the November 7 trial.

■ On November 4, 1994, Dr. Irwin filed a supplement to his application for continuance in which he submitted he was required by contract to perform oral surgery on inmates in the prison system in Jefferson City the week of November 7 so he would be unable to appear for trial. The trial court denied Dr. Irwin's motion for continuance, and the trial commenced on November 7, 1994, as scheduled.[9]

■ "As a general principle, the grant or denial of a continuance is largely within the discretion of the trial court." *Seabaugh*

*v. Milde Farms, Inc.*, 816 S.W.2d 202, 207 (Mo. banc 1991). Although, as Dr. Irwin alleges, the trial court does not enjoy absolute or arbitrary discretion in denying a continuance, the denial of a continuance is rarely reversible error. *Id.*

Dr. Irwin relies on *Wegeng v. Flowers*, 753 S.W.2d 306 (Mo.App.1988), in which this court held it was error for the trial court to deny the defendant's motion for continuance. In *Wegeng*, the plaintiff had undergone injury-related spinal surgery one month prior to the trial date. The defendants requested a continuance because until that surgery, they believed her injuries consisted of only soft tissue injuries, and that it was impossible to have a medical examination performed on the plaintiff after the surgery but before trial. The trial court denied the motion for continuance, stating it had reserved three days for the case when it was set for trial.

■ In contrast, this case had already been tried once before. Blake's injuries were the same in the second trial as they were in the first. Blake confirmed that the treatment she received after the first trial was merely a continuation of the very same treatments she had been receiving all along. She also confirmed that she did not intend to present any evidence not already given to Dr. Irwin's counsel. She also attended a deposition at Dr. Irwin's attorney's office at late notice so he could question her regarding any additional medical treatments.

■ As Dr. Irwin suggests, exercise of the trial court's discretion should be directed toward the accomplishment of fundamental fairness and the avoidance of unfair disadvantage. *Ellis v. Union Elec. Co.*, 729 S.W.2d 71, 76 (Mo.App.1987). Dr. Irwin was not unfairly disadvantaged by the trial court's denial of his motion for continuance. Dr. Irwin joined in the request for an early

---

9. Both parties cite scheduling rules which the other party (or the trial court) violated. Blake contends Dr. Irwin's application for continuance violated Rule 34.1 of the Rules of the Circuit Court of Jackson County which requires all applications for continuance to be presented to the court no later than the Wednesday before trial date. Dr. Irwin points to Rule 8.1 of the Rules of the Circuit Court of Jackson County, which pro-

vides civil trial calendars are to be published not less than four weeks in advance of trial date. However, as far as we can determine from the record before us, neither party raised these rule violations until this appeal, nor did they offer them into evidence. "[T]his court will not take judicial notice of a local rule which has not been made part of the record." *Sher v. Chand*, 889 S.W.2d 79, 81 (Mo.App.1994).

trial setting, even suggesting November 7, 1994, as a possible trial date. No new issues were to be presented in the second trial. We find it was not an abuse of the trial court's discretion to the motion for continuance. Point denied.

The judgment is affirmed.

All concur.